No. 34,425

DON C. CAMPBELL, *Appellant,* v. FLOYD E. RAMSEY, *Appellee.*

(92 P. 2d 819)

Opinion filed July 27, 1939.

A. M. *Keene* and *Harry W. Fisher,* both of Fort Scott, for the appellant.

*John L. Connolly* and *Harry Warren,* both of Fort Scott, for the appellee.

The opinion of the court was delivered by

SMITH, J.: This is an election contest case. The contest court decided for the contester. The district court decided for the contestee. The contester appeals.

The office involved is commissioner for the first district in Bourbon county. There were three men in the race—Campbell on the Republican ticket, Ramsey on the Democratic ticket and Miller running as an Independent. Campbell was running for reëlection. The return of the canvassing board gave Ramsey a total vote of 1,366 and Campbell a total vote of 1,365. This would elect Ramsey by one vote. The district contained voting precincts, as follows: East Walnut township, West Walnut township, East Marion township, West Marion township, South Franklin township, North Franklin township, East Mill Creek township, West Mill Creek township, Timberhill township, East Freedom township and West Freedom township. The county clerk did not issue a certificate of election to Ramsey. In due time Campbell filed a notice of his intention to contest the election with the county clerk, pursuant to the provisions of G. S. 1935, 25-1415.

In this statement the contester alleged first that the ballots of Irene Bryan Everhardy and Orville Oldham were cast outside the state and mailed in; that neither one of these parties was a legal voter; that in canvassing the returns from East Marion precinct the board of canvassers counted for Ramsey one tally mark as two and that this changed the result. The statement next alleged that in East Marion precinct certain persons cast ballots when they were not qualified electors in the precinct, and the names of twenty of these voters were set out in the statement. The statement further alleged that in the same precinct on several occasions county ballots instead of one county and one state ballot were given electors; that in the counting of votes at that precinct, when one of the clerks would have a greater number of tallies than the other the clerks marked up the books in an attempt to make them balance; that ballots were piled up and looked through before they were counted.

The statement then alleged that in West Freedom precinct the ballots were opened by one member of the election board before the other members of the board were present; that in this precinct legal ballots were rejected, upon which ballots seven of the voters had voted for contester and one had voted for Ramsey; that at two different times the clerk's books were out of balance with reference to the votes cast for contester and contestee and additional marks were made to make the books correspond. The statement further alleged that in Timberhill precinct at different times the ballots as cast were not clipped and deposited in the box, but were stacked upon the table; that some of these ballots might have been misplaced or carried away; that at this precinct several voters were handed marked ballots instead of blank ballots; that legal ballots were rejected and illegal ballots counted; that in this precinct electors unable to read or write, but without physical infirmity, were assisted in voting; that some of the election officials took large numbers of ballots in their hands and carried them to the second floor to be counted. The statement further alleged that in West Mill Creek precinct illegal votes were received and legal votes rejected. The statement further alleged that the illegal votes in East Marion were in so large a number and of such a nature that it was impossible to separate the legal ballots from the illegal ballots so as to determine the actual result of the election and that the entire precinct should be eliminated in determining the result between contester and contestee. The statement prayed that the total number of votes cast in East Marion be eliminated, but that if it should be determined that the legal could be separated from the illegal votes that a recount be had of this precinct and that a recount be had of the votes cast in West Freedom, Timberhill, West Mill Creek and East Mill Creek precincts and that the contester be declared elected.

The answer of the contestee denied generally the allegations of the statement and alleged that Irene Bryan Everhardy was a legal elector of West Marion and that Orville Oldham was a qualified elector of East Freedom; that in East Marion precinct the board of canvassers counted five more votes for contester than were actually cast for him. The answer denied the allegation of the statement that twenty people charged with having voted in East Marion were not qualified electors within that precinct, except that the answer admitted that two of these persons were not qualified electors be-

cause they were inmates of the county farm; that the board of county commissioners, in compliance with chapter 223 of the Laws of 1937, established two voting precincts in Marion township, but failed to designate the boundaries of each precinct, and by reason of this failure all of the twenty persons named were qualified electors except the two residents of the county farm; that one of these voted for the contester and one for the contestee. The answer further alleged that in North Franklin precinct illegal votes were received in that Mrs. Carl Knox, an unnaturalized citizen, voted for contester; and that in West Marion precinct George Drake and Jude Sylvester voted for contester, and neither were qualified electors. The answer further alleged that in East Freedom, Percy Fowler, who was not a resident of the county, voted for contester.

In a supplemental statement of intention the contester alleged that in East Marion, William Rees and Genevieve Rees voted when they were not qualified electors of the precinct; and that in East Freedom precinct J. W. Lee, Chester Lee and Anna Lee voted for the contestee and they were not qualified electors of the precinct.

The contestee filed an amended answer in which in addition to what he had already alleged he alleged that in East Marion precinct Ruth Beaman and Ina Beaman voted for contester when they were not qualified electors of the precinct; that in North Franklin precinct illegal votes were cast and counted in that Mrs. Carl Knox was allowed to vote, and that in West Marion precinct Russell Drake, Mary Drake, George Castle and Jude Sylvester, who were not qualified voters of the precinct, were allowed to vote.

With the issues thus made up the probate judge called two disinterested persons to sit with him as a contest court in compliance with G. S. 1935, 25-1413. This court heard evidence and decided to have a recount. The recount was had as to all the precincts in the district and the legality of certain votes was passed on. The result was that the contest court declared Campbell to have been elected by a majority of six votes. The contestee appealed to the district court, pursuant to G. S. 1935, 60-3301.

The case was tried upon the transcript of the evidence, including the exhibits made before the contest court. That court examined this transcript, made exhaustive findings of fact and conclusions of law.

After having passed on the various questions of fact that had been raised, and having made conclusions of law based thereon, the

trial court reached a final result by deducting twenty-two votes from the vote of 1,365 given contester by the canvassing board and deducting fifteen votes from the 1,366 given contestee by the canvassing board. This gave the contester 1,343 votes and the contestee 1,351 votes, or a majority of eight.

In arriving at the above conclusion the trial court first of all held that the contest court should not have allowed a recount of the ballots.

Since the trial court tried the appeal altogether upon the written transcript and exhibits, both parties ask this court to read this record and to decide for itself what the facts are. (See *Mathewson v. Campbell*, 91 Kan. 625, 138 Pac. 637.) In some instances each party asks us to reach a different conclusion as to facts than was reached by the trial court. There are several instances where the legality of the votes of electors and groups of electors was passed on. Each of these cases requires a finding of fact, sometimes on disputed evidence, before a conclusion can be reached. We have examined the record in each of these instances.

Contester urges that the court erred in denying his application for a change of venue on account of prejudice of the trial court. There was one affidavit introduced at this hearing which quoted a statement of the trial court tending to show prejudice. The question of whether a change of venue on this ground will be granted lies largely in the discretion of the trial court. (See *Hipple v. Hipple*, 128 Kan. 406, 278 Pac. 33.) There is not sufficient showing here of prejudice to warrant this court in holding that the court abused its discretion. Furthermore, since we have examined the same record the trial court examined, we cannot see where the contester was prejudiced.

The question of the correctness of the decision of the trial court in refusing to consider the recount of the ballots must be settled before we can tell with what figures we should start our calculation.

The statement and supplemental statement and answer and amended answer alleged illegal voting and irregularities with reference to West Marion, East Marion, East Freedom, West Freedom, Timberhill, West Mill Creek, East Mill Creek and North Franklin precincts only. There are eleven precincts in the district. The contest court ordered a recount of the entire district, including the precincts about which no complaint had been made, as well as those referred to in the pleadings.

G. S. 1935, 25-1415, provides as follows:

"The contester shall file in the office of the county clerk, within twenty days after the day when the votes are canvassed, a written statement of his intention to contest the election, setting forth the name of the contester, and that he is an elector of the county, the name of the contestee, the office contested, the time of the election, and the particular causes of contest; which statement shall be verified by the affidavit of the contester, or some elector of the county, that the causes set forth are true, as he verily believes. But before the probate judge, or, in case of his interest, the county attorney, is required to take jurisdiction of the contest, the contester must file with such judge or attorney a bond, with security to be approved by said judge or attorney, and conditioned to pay all costs in case the election is confirmed, or the statement be dismissed, or the prosecution fails."

This section does not provide for an answer and other pleadings, but this court considered such a question in *Baker v. Long*, 17 Kan. 341. There this court held that pleadings in the nature of an answer and reply were proper in such a case. The case is of interest to us here, however, because of the statement that the scope of the inquiry before the contest court was limited by the statements made in these pleadings.

In *Hooper v. McNaughton*, 113 Kan. 405, 214 Pac. 613, this court, in considering a similar question, said:

"The contester offered in evidence the official canvass in all precincts but five. On those returns he had a majority. After the contester rested, the contestee offered evidence in support of his answer. The contester then proposed to investigate the ballots in precincts, the official returns from which he had already used in his own favor. The votes from those precincts had not been complained about in the contest statement and notice, the evidence of the contestee had not related to them, and the reply to the answer was a general denial. Under those circumstances, the contester was properly denied permission to mend his hold, and there is no decision by this court which would permit him to do so." (p. 410.)

See, also, 20 C. J. 257, and *Miner v. Beurmann*, 165 Mich. 672, 131 N. W. 388.

No good reason appears as to why this rule should not be followed in this case. The inquiry and recount should have been limited to the vote in the precincts about which complaint was made in the pleadings.

The contester argues that there were not sufficient irregularities and malconduct on the part of the election officials at the various precincts shown to warrant the contest court in ordering a recount. The causes for contest of the election of candidates for county office are set out in G. S. 1935, 25-1411. That section provides in part as follows:

"The election of any person declared duly elected to any county office may be contested by an elector of the county—

"*First.* For malconduct, fraud or corruption on the part of the judges of election in any township, or of any of the boards of canvassers, or on the part of any member of either of those boards.

"*Fourth.* When the contestee has given or offered any elector or any judge, clerk or canvasser of the election any bribe or reward, in money, property or thing of value, for the purpose of procuring his election.

"*Fifth.* When illegal votes have been received or legal votes rejected, at the polls, sufficient to change the result.

"*Sixth.* For any error or mistake in any of the boards of judges or canvassers in counting or declaring the result of the election, if the error or mistake would affect the result."

G. S. 1935, 25-1412, provides as follows:

"The matter contained in the first, fifth and sixth causes of contest shall not be held sufficient to set aside the election unless such causes be found sufficient to change the result."

G. S. 1935, 25-419, provides in part as follows:

"In all cases of contested elections, either of the parties contesting shall have the right to have such ballots opened and to have all errors of the judges in counting the ballots corrected by the court or body trying such contest; but such ballots shall be opened only in open court or in an open session of such body and the presence of the officer having the custody thereof."

This court has held that the statutes do not give the contester the absolute right to have a recount, but the contester must first make such showing of irregularity and fraud as to make it probable that a recount would change the result of the election. (See *Free v. Wood*, 137 Kan. 939, 22 P. 2d 978.)

The decision of this question then requires an examination of the record on this point. There was evidence that in East Marion precinct a number of voters received two county ballots instead of a county ballot and a state ballot. In this precinct there were eleven county ballots passed out through error. There was also evidence that in this precinct a large number of ballots were taken out of the ballot box and piled on the table before they were counted, and that on one occasion the contestee was given an extra mark on the tally sheet to make the clerk's books balance. There was evidence that at Timberhill precinct fifteen or twenty ballots were piled on the table at a time before they were counted; that voters were given marked ballots; and that one time while the counting was going on a member of the counting board came downstairs, picked up a handful of ballots and took them upstairs to count.

There was evidence at West Freedom precinct one of the judges of the election arrived at the polling place before the rest of the board and when they arrived he had the envelopes containing the ballot opened. The election laws provide in detail just how an election shall be conducted from the time notice of the election is first published, just how the ballots shall be printed and distributed, how the board is appointed, the polls opened, the actual voting done and the votes counted. The statute is minute in its direction as to the counting and the record of the counting and the care of ballots. The provisions of these statutes were violated or ignored in many instances in this election. Where election boards were so careless as to the well-known rules of carrying on an election and ignored them so flagrantly, while the evidence does not show any willful fraud, it is not a violent assumption that the boards were careless enough in their work of counting that a recount would probably change the result of the election, since the winning candidate only had a majority of one.

There is another question, however, that must be settled before we can decide whether the court was correct in its refusal to consider the result of the recount.

The question to be decided in an election contest is which candidate received the most legal votes. In determining that question the ballots are the best evidence; that is, they are the best evidence if when the contest is being heard the contest court can be sure that the ballots it is asked to count are the same ballots that were counted at the polling places—otherwise not. For that reason the statutes throw the many safeguards around the ballots after they are counted, requiring them to be strung on a wire, uniting the ends of the wire and sealing them with sealing wax, enclosing the ballots in an envelope, sealing it and returning them to the officer from whom the election officials received them. (See G. S. 1935, 25-419.) The same section also provides as follows:

"Such officer shall carefully preserve all such ballots for six months, and at the expiration of that time shall destroy them by burning, without previously opening any of the said envelopes."

The officer referred to in this case is the county clerk.

Taken in its most favorable light for the contester, this record discloses that the county clerk did not comply with the above statute. The ballots in this case were put in a room where, to say the least, there was ample opportunity for a number of people other

than the county clerk to have access to them. It would not add anything to this opinion to detail this evidence here, but the contest court found that the ballots from East Freedom precinct had been tampered with, and on that account did not make a recount of the ballots from that precinct. The trial court made the same finding, and found in addition that the ballots from the other precincts had been tampered with. In addition to the fact that several people had access to these ballots there is other evidence on this point. After the recount had been had the contestee asked permission of the contest court to reopen the case for further evidence. This was prompted by the fact that in East Freedom precinct the count of the contest court had disclosed that every voter had voted for the office of county commissioner. This looked strange, so when the case was reopened the contestee proceeded to introduce proof that several ballots had been cast upon which no vote had been cast for county commissioner. The same general situation was found in West Freedom precinct. The question of whether the ballots had been tampered with may be proved by circumstantial evidence, just the same as any other question of fact. In a case such as this, where two more votes for the contester would decide the election, the result might be attained by looking through the ballots and voting those ballots for county commissioner, where the voter had not seen fit to vote for that office. We hold that there was opportunity for several persons to tamper with these ballots and that some person did tamper with them.

In *Hudson v. Solomon,* 19 Kan. 177, this court held:

"As between the ballots cast at an election, and a canvass of those ballots by the election officers, the former are the primary, the controlling evidence.

"In order to continue the ballots controlling as evidence, it must appear that they have been preserved in the manner and by the officers prescribed in the statute, and that while in such custody they have not been so exposed to the reach of unauthorized persons as to afford a reasonable probability of their having been changed or tampered with." (Syl. ¶¶ 1, 2.)

To the same effect is *Spidle v. McCracken,* 45 Kan. 356, 25 Pac. 897. There the court held:

"The returns of the election officers are prima facie evidence of what they purport to show with regard to the number of votes cast and for whom cast, although the ballots themselves, when properly identified, are still better evidence. But whenever it is shown that the ballots have been wrongfully tampered with, they lose their controlling character as evidence; and when there is nothing but discredited ballots to contradict the election returns, the returns themselves will be held to be conclusive."

The question of whether the ballots had been subjected to fraudulent manipulation was a proper subject of inquiry before the court could decide whether the ballots would be admitted as evidence. (See *Moorhead v. Arnold,* 73 Kan. 132, 84 Pac. 742.) In this case an examination of the record has caused us to reach the conclusion that the trial court did not err in refusing to recount the ballots or in refusing to consider the result of the recount of the contest court.

In this connection the contester argues that the contest court should not have opened up the case for further evidence after the recount had been had. In an inquiry such as that held by an election contest court the end sought is an arrival at the true state of facts. The scope of its inquiry should not be circumscribed by technical rules. In *Moorhead v. Arnold,* supra, this court said:

"Upon the suggestions to it of suspicious facts it was not only authorized, but was under obligation, to take the steps necessary to ascertain the truth."

The contest court in this case did what it was its duty to do in conducting the further inquiry as to whether these ballots had been tampered with.

This brings us to a consideration of the questions as to the illegal voting. The trial court refused to consider the result of the recount and started calculations with the vote as given each candidate by the board of canvassers. We have seen that this was—contester, 1,365; contestee, 1,366. When the board of canvassers canvassed the returns from East Marion it discovered four places in the tabulation of the vote of contester where the election board had placed six marks in a subdivision of the line for counting his votes where there should have been five. This resulted in his being given four fewer votes in the totals than were actually cast for him, according to the tallies. The same situation was found with reference to the record of the vote cast for contestee. The canvassing board accordingly added four votes to the total for contester and two to the total for contestee to get the totals already noted. The contest court did not make a specific finding on this point, but did find the totals on the pollbooks certified to the proper officers of the county to be correct. The result of this was that the contest court did not give the contester the benefit of the four tallies for which he had been given credit nor the contestee the benefit of the two tallies.

The trial court made a positive finding that the four tallies for contester and the two tallies for contestee could not be found on

the pollbooks. The contester argues that this finding is not supported by the evidence. This requires an examination of the record. The original pollbooks, as well as a magnified reproduction of that part of the book which contester argues shows the extra tallies, is furnished us. These books are so made up that there is a space at the lefthand side where the names appear and then spaces extend clear across the page. These spaces leave room for four vertical marks, and then for the fifth tally a line is drawn from the top of the mark that is the farthest to the right across the four vertical marks to the bottom of the mark that is farthest to the left. By this means five votes are tallied.

After an examination of exhibit "E," one of the pollbooks for East Marion, and of the enlarged photographs of that portion of this book, which contains part of the record of the vote for contester and contestee, we find that there actually are four more tallies for contester and two more for contestee than are shown on the totals carried out in this book. Thus, had all the tallies for contester been counted, his total would have been 200 rather than 196, and the total for contestee would have been 230, which, added to the totals from the other book, makes a total of 270 for contester and 320 for contestee. Exhibit "E" is the pollbook that was brought in to the office of the county clerk in accordance with G. S. 1935, 25-426. That section provides as follows:

"After canvassing the votes in the manner aforesaid, the judges, before they adjourn, shall put under cover one of the pollbooks, seal the same, and direct it to the county clerk of the county where the return is to be made; and the pollbook, thus sealed and directed, together with the ballots sealed as hereinbefore required, shall be conveyed by one of the judges, to be determined by lot if they cannot otherwise agree, to the county clerk of the county, within two days from the day of the election; and the other pollbook shall be deposited with a trustee of the township or clerk of the city, as the case may be, within three days of the election, there to remain for the use of the persons who may choose to inspect the same."

G. S. 1935, 25-701, is the section that provides for the canvassing of election returns. It provides in part as follows:

"On the Friday next following the election the county clerk and the commissioners of the county, or a majority of said commissioners, at ten o'clock a. m. of said day, shall meet at the office of said county clerk, and shall proceed to open the several returns which shall have been made to that office; and said commissioners shall determine the persons who have received the greatest number of votes in the county, for the several county, district and state officers . . ."

It will be noted that this section makes it the duty of the canvassing board to determine the persons who have received the greatest number of votes.

Our question is whether the board is confined to the figures carried out as to the total votes or does it have authority to examine the tallies? It is worthy of note that the tally sheets are bound in a book with the pollbook. This has been the practice in our state for so long that by a practical construction of the statute they are as much a part of the return made to the county clerk as the pollbooks themselves. Indeed, in effect they are a part of the pollbook, which the statute provides must be returned to the county clerk. See *Rice v. County Board of Canvassers,* 50 Kan. 149. In that case the plaintiff asked a writ of mandamus against the board of canvassers to compel it to recanvass the returns from a certain precinct. He claimed that the totals in the pollbook from that precinct gave him 96 votes, but that the board only gave him 95. This court examined the pollbook and determined that there were actually only 95 tallies. In considering the question this court said:

"The preponderance of decisions under statutes somewhat similar to ours, however, appears to uphold the view that the tally or enumeration of the votes in the pollbooks may be considered in verifying the returns, and that if a disparity exists between the footings and the tallies the latter should control." (p. 152.)

It should be noted, however, that this court did not place the final outcome of the action on that point. The case was decided on the analogous point that with the record in the condition it was in as to the returns and the tallies the court could not say there was a clear legal duty on the board of canvassers to make any different returns than it had made.

The question was considered again in *Hughes v. Parker,* 63 Kan. 297, 65 Pac. 265. This was a city election, but this court held that notwithstanding the fact that the statute did not specifically require the clerks of the election to keep tally sheets, the keeping of tally sheets was a legal requirement and were part of the return. On the question with which we are interested this court said:

"In the case cited, it was noted that the decisions as to whether the tally marks may be examined by the board of canvassers were at variance, but that the weight of authority was in favor of allowing them to be considered in verifying election returns, and also in favor of giving them controlling force in case of a discrepancy between them and the certified result. In our judgment this is the better rule, because the tally marks are made concurrently

with the count of the vote, and are, therefore, the original and primary evidence of such vote, the certificates of totals being compiled secondarily." (p. 299.)

The rule commends itself to us. The provisions of the statute indicate that the board of canvassers have more of a duty to perform than merely to tabulate the votes from the various precincts. Were this not the rule the election boards might make a mistake in the hurry and confusion of getting the pollbooks ready to bring in to the county clerk after a day and night of tedious and tiresome work, and there would be no way to correct the error. It is unthinkable that the will of the electors might be thus thwarted.

The contestee makes an argument that the pollbook that was kept in the township showed the same totals for these two candidates as the book which was returned to the county clerk and made the basis for the canvass. Contestee argues that on this account the canvass should be made from the totals returned rather than from the tallies in the book that was returned. This does not follow. The statute provides that one of the pollbooks from each precinct shall be returned to the county clerk and the board of canvassers shall determine from these pollbooks which candidates received the most votes. It might be difficult to explain how the two books would have a different number of tallies in them, since they were both kept simultaneously. The fact remains, however, that the extra tallies are there. The board of canvassers was correct in allowing Campbell 270 votes and Ramsey 320 votes from East Marion.

The trial court deducted four votes from the totals of contester and two votes from the totals of contestee. Since we have reached a different conclusion on this point than that reached by the trial court, we will not deduct these votes from the totals. This still leaves contester 1,365 and contestee 1,366.

We shall next consider the question of the eighteen voters from East Marion, who contester claims had no right to vote in that precinct, since they lived in West Marion. This question arises on account of an attempt on the part of the county commissioners to divide Marion township into two precincts in compliance with chapter 223 of the Laws of 1937. The board of county commissioners passed the following resolution on April 26, 1938:

"The east precinct of Marion township shall be all that portion of Marion township east of a line beginning at the northeast (NE) corner of section six (6), township twenty-five (25), range twenty-two (22), thence running south

six (6) miles to the parallel, thence west one-half (½) mile, thence south through the middle of sections five, eight, seventeen and twenty, township twenty-six (26), range twenty-two (22), to the south line of Marion township, and the west precinct of Marion township shall be all that portion of said township west of said line."

The resolution looks all right at first, but the fact is it was drawn from an incorrect map. When the line south from the northeast corner of section 6, township 25, range 22, reaches the parallel, in order for it to pass through the middle of sections 5, 8, 17 and 20 it would have to jog about 62 feet east rather than a half mile west, as was provided in the resolution. It will be seen that this left a strip of territory about one-half mile wide and four miles long about which there might very well be an honest doubt as to whether the people who lived thereon were in the east or west precinct of Marion township. If the dividing line should be held to be the line drawn through the middle of sections 5, 8, 17 and 20, then these people would be in the west precinct. If it should be held to be a line drawn south from a point one-half mile west of the point where the line from the north intercepts the parallel, then they would be in East Marion.

One provision of chapter 223 of the Laws of 1937 is as follows:

"Upon making such division into precincts, the board of county commissioners shall designate the boundaries of each precinct and thereafter a voter shall not be eligible to vote in any precinct of the township or district other than the one in which he resides."

These eighteen electors lived west of the one of these lines that is farthest west; that is, these electors were residents of West Marion precinct no matter which line we hold to be the dividing line between the precincts. Under such circumstances they had no right to vote in East Marion since they were not residents of that precinct. (See Laws 1937, ch. 223.)

In order for us to hold that these electors had a right to vote in East Marion it would be necessary for us to hold that the action of the board of county commissioners in dividing the township into precincts was a nullity and there was no division of the township at all. We are unable to reach such a conclusion. There was a division. On account of the residence of these voters upon which we have already touched it is unnecessary for us to settle in this opinion which one of these lines is the correct one. We hold, however, that the township was actually divided into two precincts—East Marion and West Marion.

Contester took the position that these voters were residents of West Marion and illegal voters in East Marion. The trial court agreed with this argument and held them to be illegal voters. The voters were the following: (1) Harold Wolfe, (2) Bert Wilson, (3) E. A. Roof, (4) Katherine Roof, (5) C. A. Ramsey, (6) Lyle Ramsey, (7) Elmo Ramsey, (8) Chester Ludlum, (9) Naomi Ludlum, (10) Harold Ramsey, (11) Marie Ramsey, (12) Paul Ramsey, (13) Otto Marquardt, (14) Robert Wilson, (15) Irene Wilson, (16) Mary Ramsey, (17) Anna Mae Ramsey, and (18) Mary Rogers Ramsey.

Since the trial court found that these eighteen had no right to vote in East Marion it was necessary to ascertain for which candidate each one voted. The practice followed at the trial before the contest court was to call each one of the voters before the court, then ascertain whether he was a legal voter, and if it was determined that he was not a legal voter then whether he voted for either one of the candidates for county commissioner, and if the voter answered in the affirmative then to ascertain for which candidate he voted.

When Mary Ramsey was called she testified that she did not vote for either contester or contestee. Anna Mae Ramsey and Mary Rogers Ramsey were not called. That left fifteen illegal votes out of the eighteen. It was the duty of the trial court and is our duty to ascertain for whom they voted. The trial court read the record of the testimony before the contest court with reference to these voters and found that seven voted for contester and eight for contestee. The trial court deducted seven of these votes from the vote of contester and eight from the vote of contestee.

When it became apparent in the contest court that that court was going to hold these eighteen votes were illegal each side started out to prove that as many of them as possible voted for the other candidates.

A question is raised about the vote of Naomi Ludlum. When she was asked whether she voted for contester or contestee she testified:

"Q. At that election, did you vote for either Mr. Ramsey or Mr. Campbell for commissioner of the first district? A. Yes, sir.

"Q. Now, Mrs. Ludlum, for which one of those two gentlemen did you vote at that election? A. I think I voted for Mr. Ramsey, but I wouldn't swear to it.

"Q. You don't know who you voted for? A. I am not absolutely certain, because—well, I didn't know anything about anything coming up or anything, and I knew neither one of the gentlemen."

The trial court found that Naomi Ludlum voted for Ramsey. Counsel for the contestee argues here that the above is not sufficient evidence to warrant a finding that she voted for Ramsey. We agree with the contestee on this. She seems to have been called by the contest court. She was not proffered by either the contester or contestee. Under such circumstances we have concluded that the vote of Naomi Ludlum should be classed with that of Anna Mae Ramsey, Mary Rogers Ramsey and Mary Ramsey, about whom we are unable to ascertain for whom they voted. This leaves the result of the consideration of this group of voters as seven voting for contester and seven for contestee.

There remains the question of the vote of two young brothers, Lyle and Elmo Ramsey. These young men testified that they voted for contestee. Whereupon evidence was introduced to the effect that they had told certain people they had voted for contester. The trial court found as a matter of fact that they had voted for Campbell. We have examined the record on this matter and do not believe the trial court was warranted in making such a finding. In a situation such as the one here presented the best evidence of how an elector voted is his own sworn testimony. It would be an unsound and dangerous rule to permit such testimony to be upset by the testimony of some other person that he heard the elector say on the street or somewhere that he voted for someone else. We find as a matter of fact that Lyle and Elmo Ramsey voted for Ramsey.

There are two other voters in this group about which contestee raises a question. These two voters are Robert Wilson and Irene Wilson. They both testified that they voted for contestee. Counsel for contestee brought out on cross-examination that Robert worked for the county and had campaigned for the contester. Contestee asks us here to find that they voted for contester. We have examined the record on this and have reached the same conclusion as that reached by the trial court, that these two electors voted for contestee. The result of the above findings is that five of these voters are held to have voted for contester and nine for contestee. Since they were all illegal voters, it follows that five votes must be deducted from the total vote of contester of 1,365, which leaves him 1,360, and nine must be deducted from the vote of contestee, of 1,366, which leaves him 1,357.

We shall next consider the votes of Zack Morning and Ed Billings. They voted at East Marion. They were residents of the county poor farm, which is located in East Marion precinct, and the trial court held that they did not acquire a residence in the precinct by reason of their residence at the county farm. Morning voted for contester and Billings for contestee, so the decision on the legality of their votes cannot affect the result of this action. One vote must be deducted from the votes of each on account of these two voters, which leaves the final result—contester, 1,359; contestee, 1,356.

The next question we shall consider is with reference to the vote of William Rees and Genevieve Rees, his wife. In the supplemental statement of contester he pleaded that these two people voted at East Marion when they were not qualified voters in that precinct. They did vote at East Marion. The basis of the claim that they were not residents of that precinct was that Mr. Rees was teaching school at Savonburg, Kan.; that after they were married they lived on a farm in Timberhill precinct for years; that after he had decided to attend school at Pittsburg they had stored their furniture at Mapleton in Timberhill precinct and Mrs. Rees had moved to Uniontown in East Marion precinct with her parents and they had regarded this as their home ever since. The contest court held that they were legal voters and refused to let her be asked for whom she voted for commissioner. The trial court also held that they were legal voters. The contester asks us to hold differently here and to find that they both voted for Ramsey. We are saved the trouble of settling the question of whether they are legal voters because only Mrs. Rees took the stand and she was not permitted to testify for whom she voted. Hence we cannot make such a finding. The contester offered to prove by her that she voted for Ramsey, but we cannot make a finding on that evidence alone. No affidavit or other showing was made as to what her testimony would have been. Mr. and Mrs. Rees fall in the group we have already mentioned about whose vote we are unable to make a finding. These votes will have no effect on the outcome of this action.

We shall next consider the vote of Mrs. Ruth Beaman and Miss Ina Beaman. In his amended answer the contestee alleged that these two electors voted at East Marion when they were not residents of that precinct. The trial court found that they were not entitled to vote at East Marion and that they voted for contester. These two votes were deducted from the total vote of contester.

Contester asks us to examine this record and find that they were legal residents of East Marion. The testimony shows that the husband of Ruth Beaman and the father of Ina owned a farm in East Marion precinct, but had rented the farm and moved to Moran. The husband voted at Moran in the election and the wife and daughter came to Uniontown and voted. The father had been working for a motor company since 1930, but they had actually been away for about eighteen months. In addition to this, Mr. Beaman testified that he considered Uniontown as his home and his absence ·in Moran as temporary, and that when his employment was over at Moran he intended to go back to Uniontown to his farm; that on election day he saw he was not going to get away to get to Uniontown before the polls closed, so he just went in and voted at Moran; that he voted at every preceding election at Uniontown in East Marion precinct. The testimony of Mrs. Beaman and the daughter was just as positive as to their intention to return to Uniontown and that Uniontown was their permanent home. The basis of the finding of the trial court was that Mr. Beaman voted at Moran—hence, the proper place for his wife and daughter to vote was Moran. This would be true if the proper place for Mr. Beaman to vote had been Moran, but we find from all the evidence that he was a resident of East Marion precinct and entitled to vote there, as well as his wife and daughter. These two votes should not have been deducted from the total of contester.

We shall next consider the question of five electors in Timberhill township. These are Zeb Harris, Ray Harris, Fred Wallace, Leah Womelsdorff· and Byrl Berry. These five voters presented themselves and asked that they be given assistance in marking their ballots. The evidence discloses they were not blind nor physically disabled. The trial court held that these five electors cast illegal votes, voted for contester and should be deducted from his total vote. The contest court called these electors on its own motion. It is not argued that these people did not have a right to vote. There is no educational qualification for suffrage in our state.

G. S. 1935, 25-416; provides in part as follows:

"On receiving his ballot the voter shall forthwith and without leaving the enclosed space retire alone to one of the voting booths, and without undue delay unfold and mark his ballot as hereafter described; if unable to mark his ballot by reason of physical disability he must so declare on oath, to the judges of elections, and he or she shall then be accompanied to the booth by a judge and clerk of election board of different political parties who shall

mark his ballot as he shall direct: *Provided,* That any person requiring assistance by reason of blindness in marking his or her ballot as provided herein may choose his or her assistant to aid in the marking of such ballot."

G. S. 1935, 25-417, provides as follows:

"Clerks of elections shall enter upon the poll list the name of any elector who received assistance in marking his ballot because of physical disability, a memorandum of the fact, and such clerks and judges shall thereafter give no information as to how said ballot was marked, and shall state the name of such assistant chosen by a blind person and if such person so assisting the blind voter be a relative, either by blood or by marriage, such fact shall be stated in the memorandum. Intoxication shall not be regarded as a physical disability and no intoxicated person shall be entitled to assistance in marking his ballot. . . ."

It will be noted that the section first quoted above makes it the duty of the judges of the election to administer an oath to an elector who proffers his vote and asks for help in marking the ballot and to thereupon inquire as to whether he asks help on account of physical disability.

The section last quoted makes it the duty of the clerks of the election to enter upon the poll list the name of any elector who received assistance in marking his ballot because of physical disability.

Neither one of these sections was complied with in this case. When those electors presented themselves and requested help the judges should have asked if they needed help on account of physical disability. They would have answered in the negative. Whereupon it would have been the duty of the election board to advise them that they could not have help. They would still have been entitled to a ballot, however. The only thing denied them is help. They had a right to try to vote. Perhaps they could read well enough to make out some of the names on the ballot. At any rate, theirs is the right to spoil a ballot if they so desire. They cannot be disfranchised altogether because the election board neglected to do its duty. It may be that a literacy qualification for voting in this state would be a good thing, but if so it is the duty of the legislature to present such matters to the people by way of a constitutional amendment, not of this court to write it into an opinion. It is true that the section first quoted above requires the voter to "retire alone" to the voting booth. Here again we have a failure of the election board to do its duty. We hold that these five votes should not have been deducted from the total vote of contester. This still leaves the total vote—contester, 1,359; contestee, 1,356.

We shall next consider the question raised with reference to the votes in West Marion. First, we have the vote of Russell Drake and Mary Drake, his wife. The contest court found that these two electors voted at Bronson in West Marion, but that their residence was Uniontown in East Marion. The trial court found, as a matter of fact, that they were residents of East Marion and deducted their votes from the total vote of contester. The testimony of Mr. Drake discloses that this young couple had lived at Uniontown for about two weeks before the election; that they had been out of the state about 26 months; that on their return they went to his father's place near Bronson; that they voted at Bronson and never voted anywhere else; that they always regarded his father's place as their permanent home; that they had always lived there until the trip west; that he was working for the county on temporary bridge work and they moved into Uniontown so that his boss could come right through Uniontown and pick him up; that the residence at Uniontown was a temporary residence, depending on his job; that when the job was over they intended to return to live with his father at Bronson. His vote was challenged when he presented himself at West Marion, whereupon he made the affidavit as required by statute. His wife did not offer to vote, but they both went in to Fort Scott and told their story to the county attorney. This official gave her a note to the election board and they returned to Bronson and she was permitted to vote. The testimony of Mrs. Drake was to the same effect. From the transcript it appears that the contest court found that these two voters were not entitled to vote at Bronson on account of some provisions of the Laws of 1937. We are not given the benefit of a citation to the laws of that session. We can find nothing in them that changes the rule as to residence. Not every temporary change of abode constitutes a change of residence. The evidence in this instance has convinced us that these two voters never did abandon their residence in Bronson; were legal voters there and their two votes should not have been deducted from the total vote of contester. There is another question about Mr. Drake's vote as to whether it was counted, since his vote was challenged, and he was sworn as to his residence the second time. The presumption is that his vote was counted in accordance with the statute. At any rate, it would make no difference in the final outcome of this case.

The next question we shall consider is with reference to the votes of George Castle and Jude Sylvester in West Marion. There was some testimony introduced as to the residence of these two voters, but the trial court found that they were legal voters in West Marion and neither party questions that here. The result is those two votes have no effect on the final outcome of this action.

We shall next consider the questions raised with reference to the votes in East Freedom precinct. The first are Percy Fowler and Orville Oldham. The trial court found that both of these were legal voters in East Freedom. There is no question raised here about Fowler. The contester argues here that the vote of Oldham was not legal; was for contestee and should be deducted from his total vote. The record discloses that he had lived in East Freedom all his life; that a year before election he had entered the civil service of the United States and was working at Baltimore. There is no evidence that he had abandoned his home in East Freedom and the fact that he sent his vote back there is some evidence that he had not abandoned it. Persons employed in the service of the United States government neither acquire a residence for the purpose of voting in the election districts in which they may be stationed nor lose their political domicile in the places from whence they come. (See 20 C. J. 73.) We hold that this was a legal vote.

The next votes in East Freedom we shall consider are those of J. W. Lee, Anna Lee, his wife, and Chester Lee. The contest court found that they were nonresidents of East Freedom, not entitled to vote in that precinct, and that they voted for the contestee. The trial court agreed with this finding, and deducted their vote from the total vote of contestee. The contestee contends here that these people were residents of Fulton in East Freedom and hence legal voters there. The testimony of Mr. Lee disclosed that the family lived about a mile and a half east of Fulton, which is in Osage township in Bourbon county; that they had lived there since the 1st day of March, 1938; that he worked in Fulton; that he moved to his present location because there was no house in town he could rent as cheaply as he could rent the place where he was living for the purpose of lowering his rent; he had no intention of changing his residence to the other precinct; that he was just living there because he had no house to move his family into in Fulton; that he always intended to move back to Fulton as soon as he could get a suitable house. On redirect examination he testified that at first he lived

three miles straight west of Mapleton for six years; that he moved from there to the place right west of Fulton; that he lived there five years; that he moved from there to where he was living at the time he voted, that is, Osage township; that when he was living at the first place he voted at that precinct; that when he lived near Fulton he voted there once; that at this election he voted for contestee. The testimony of the son Chester Lee was that he and his wife lived with his folks; that he could not say that he had any intention of claiming any particular place as his residence for the purpose of voting; that he did not regard the place with his father as a permanent place of residence; that he voted for Mr. Ramsey. The testimony of Mrs. Lee disclosed that she voted in the primary and the general election at Fulton; that they were only on the farm in Osage township until they could get a suitable house in Fulton. From the colloquy that appears in the record the contest court placed this family in the same category with the Beaman family and the Drakes and held that they were all nonresidents of the precincts where they voted. We have examined this record and find that the cases are not analogous. In the case of the Lees there are no circumstances which tend to prove that they had always regarded Fulton as their home. They had been renters for a while and had lived and voted in another precinct altogether. Then they had rented a farm near Fulton. When they moved to the place where they lived at the time they voted they had severed all connections that bound them to Fulton. We do not hold that a voter can make a place his residence by swearing he intends to return there or that he regards it as his residence. Such a statement will only be taken for what it is worth along with other evidence. In this case a persuasive piece of evidence is the statement of young Mr. Lee that he did not regard any particular place as his residence. We find that J. W. Lee, Chester Lee and Anna Lee were illegal voters in East Freedom precinct and the trial court was correct in deducting these three votes from the total vote of contestee. This leaves—contester, 1,359; contestee, 1,353.

The next vote we shall consider is that of Irene Bryan Everhardy in South Franklin. The record discloses that she lived near Bronson until in 1936. She then married and moved to Washington, D. C.; that her husband never did reside in Bourbon county; that he works at the treasury department and his wife had been there two years and four months when she tried to send her out-of-state

ballot back to South Franklin township. She voted for contestee. The legal residence of Mrs. Everhardy is that of her husband. (See 20 C. J. 69.) His residence for the purpose of voting was the place which he regarded as his place of residence when he entered the service of the United States. (See 20 C. J. 73.) We hold, therefore, that she was not a legal voter in South Franklin and her vote was correctly deducted from the vote of contestee. This leaves the result—contester, 1,359; contestee, 1,352.

The next vote we shall consider is that of Mrs. Carl Knox from North Franklin. She was an unnaturalized alien and had no right to vote, and voted for contester. This vote was correctly deducted from the total vote of contester. This leaves the final result—contester, 1,358; contestee, 1,352.

This concludes a consideration of every vote that was passed on by the contest court and the trial court.

The contester argues here that the entire vote of East Marion should be stricken out and not considered because it was impossible to separate the legal votes from the illegal votes. While the manner in which the election was conducted in East Marion was not satisfactory in many respects, we find that we have been able to ascertain who were the legal voters and who were the illegal voters in this precinct. The vote from that precinct has been considered, along with that from the other precincts.

The judgment of the trial court is reversed, with directions to render a judgment holding the contester, Don C. Campbell, is the duly elected commissioner of the first district of Bourbon county, Kansas.

ALLEN, J. (dissenting): At the election held on November 8, 1938, Don C. Campbell and Floyd E. Ramsey were candidates for the office of county commissioner in the first commissioner district in Bourbon county. By the certificate of the board of canvassers, Ramsey was declared elected by one vote. Campbell instituted contest proceedings. Under the pleadings sharp issues of fact were presented. Thus paragraph 1 of the contester's statement of intention reads:

"(1) That illegal votes were received among the ballots cast outside of the state of Kansas and sent to Bourbon county and canvassed by the board of canvassers, to wit: The vote of Irene Bryan Everhardy and Orville Oldham.

"That said above-named parties are not qualified electors of Bourbon

county, Kansas. That by reason of counting and canvassing of said votes and each of them, the result of the election was changed.

"That the board of canvassers in canvassing the returns from East Marion precinct counted the marks or tallies representing votes counted, counted for Floyd E. Ramsey one tally mark as two tally marks and so erroneously canvassed the returns from said precinct. That said erroneous canvassing changed the result of the said election."

The answer of contestee, as to the above allegations, reads:

"1. Said Floyd E. Ramsey, contestee, further specifically answering part No. 1 of the statement of intention, alleges that Irene Bryan Everhardy was and is a qualified elector of the west precinct of Marion township of Bourbon county, Kansas; that she has always maintained her residence as a voter in said district and has so declared her intentions; that Orville Oldham is and was a qualified elector of East Freedom township of Bourbon county, Kansas, and was such qualified elector and voted in the election held on the 8th day of November, 1938; that he cast his ballot in compliance with law; that he has always maintained East Freedom township as his place of residence for the purpose of voting; that he is engaged in the government service and that by reason of being engaged in the government service he did not acquire elsewhere nor lose his right to vote in. said East Freedom township of Bourbon county, Kansas.

"Further specifically answering the last paragraph of part No. 1 of said statement of intention, said contestee alleges that in canvassing the returns from East Marion precinct, the board of canvassers counted the marks or tallies representing votes counted and counted for Don C. Campbell five (5) more votes than were actually cast for him and as were returned by the election board of said township, and that in truth and in fact the board of canvassers credited the contester, Don C. Campbell, with five (5) more votes than he actually received."

Other allegations of the contestant's statement of intention is met by denials in the answer of contestee.

The case was tried in the district court upon the transcript of testimony used in the contest court and upon the exhibits which were introduced in evidence, before the contest court. No new evidence was introduced before the district court.

The district court made extensive findings of fact and submitted conclusions of law. The court found that Ramsey was elected by a majority of eight votes.

The errors specified by appellant are as follows:

"1. The court erred in refusing to grant a change of venue.

2. The following findings of fact are not supported by evidence, to wit: Findings numbered: 4, 5, 10, 12, 13, 14, 17, 18, 19, 20, 21.

3. The following findings of fact are contrary to the evidence, to wit: Findings numbered 4, 5, 10, 12, 13, 14, 17, 18, 19, 20, 21.

4. The conclusions of law are erroneous, to wit: 1, 2, 3, 4, 5, 6, 7, and in declaring contestee, Floyd E. Ramsey, elected.

5. The court erred in overruling motion for new trial."

Counsel for appellant in this brief states:

"As the case was tried in the district court altogether upon documentary evidence and as we believe the supreme court will try the case substantially as if it were a case originally brought in this court, we will attempt to argue and brief the case more from the standpoint of what we believe the decision ought to be than from the point of attempting to show the error of the district court. Thereafter, the errors of the trial court will clearly appear."

It is also stated in the brief of appellee:

"For the want of time appellee is compelled to pray the indulgence of the court in that there are certain errors and omissions in the abstract that should necessitate a counter abstract, and to meet the wishes of the court appellee has insufficient time to prepare a counter abstract and is taking the liberty to send the original transcript and such exhibits as appellee feels the court should personally inspect, and in this brief the court will find references to the transcript and certain exhibits."

We are thus urged by appellant "to try this case substantially as if it were a case originally brought in this court." In other words, we are to sift the testimony, weigh the evidence and determine the facts as a trial court. The suggestion of counsel fell on fertile ground. In the majority opinion it is stated:

"Since the trial court tried the appeal altogether upon the written transcript and exhibits, both parties ask this court to read this record and to decide for itself what the facts are. (See *Mathewson v. Campbell,* 91 Kan. 625, 138 Pac. 637.) In some instances each party asks us to reach a different conclusion as to facts than was reached by the trial court. There are several instances where the legality of the votes of electors and groups of electors was passed on. Each of these cases requires a finding of fact, sometimes on disputed evidence, before a conclusion can be reached. We have examined the record in each of these instances." (*Ante,* p. 372.)

Step by step we have traveled through the transcript, the exhibits containing the pollbooks, tally sheets, tabulations of the recount, etc., and from such examination we have determined the facts. This is a trial *de novo.*

By what authority of law has this court been translated from an appellate court into a trial court? This court was created and its jurisdiction defined by the constitution. That instrument provides:

"The judicial power of this state shall be vested in a supreme court, district courts, probate courts, justices of the peace, and such other courts, inferior to the supreme court, as may be provided by law; and all courts of record shall have a seal to be used in the authentication of all process." (Art. 3, § 1.)

"The supreme court shall have original jurisdiction in proceedings in quo warranto, mandamus, and habeas corpus; and such appellate jurisdiction as may be provided by law. . . ." (Art. 3, § 3.)

In *Auditor of State v. A. T. & S. F. R. Co.*, 6 Kan. 500, these provisions were construed by this court. It was there said:

". . . This court is created by the constitution, and the outlines of its jurisdiction established by that instrument. It has original jurisdiction in three specific classes of cases, which it possesses independent of any legislation, and such appellate jurisdiction as may be provided by law. The jurisdiction of the court, under this last provision, is wholly dependent upon the will of the legislature. It may be enlarged or restricted, as the legislature shall prescribe; but in all its acts the legislature is still under the restriction that the jurisdiction conferred must be appellate, not original. . . .

"The term, then, 'appellate jurisdiction,' as used in the constitution, has some other meaning than that there should be merely an appeal from some decision or act of some officer of the state, and it is this meaning of the term that is to be sought for. In this search we are not left entirely to our own reason for guidance. The constitution of the United States contains a clause of similar import, which has been the subject of comment and decision by the supreme court of the United States, and the substance of their decision is thus stated by Judge Story in his Commentaries on the Constitution, sec. 1761: 'The essential criterion of appellate jurisdiction is that it revises and corrects the proceedings in a cause already instituted, and does not create that cause. In reference to judicial tribunals, an appellate jurisdiction, therefore, necessarily implies that the subject matter has been already instituted and acted upon by some other *court,* whose judgment or proceedings are to be revised. . . .'" (pp. 504, 505.)

In *State, ex rel., v. Telephone Co.*, 115 Kan. 236, 270, 223 Pac. 771, it was said:

"We are, in effect, asked to try this case *de novo.* Under the constitution, the jurisdiction of this court is appellate only, except in three specific instances. That jurisdiction cannot be extended so as to make this court try appealed cases *de novo.* (*In re Burnette*, 73 Kan. 609, 85 Pac. 575; *The State v. Brewing Assn.*, 76 Kan. 184, 90 Pac. 777; *Coleman v. McLennan*, 78 Kan. 711, 744, 98 Pac. 281; *Jones v. Insurance Co.*, 85 Kan. 235, 236, 116 Pac. 484; *Hess v. Conway*, 93 Kan. 246, 144 Pac. 205; *Girten v. Zinc Co.*, 98 Kan. 405, 158 Pac. 33; *Schwint v. Ballentine*, 103 Kan. 296, 173 Pac. 926; *The State, ex rel., v. Rayl*, 111 Kan. 571, 572, 207 Pac. 192. A number of earlier cases might be cited.)"

In the important case, *In re Burnette*, 73 Kan. 609, 616, 85 Pac. 575, after quoting the constitutional provisions above set out, it was said:

"The distinction between original and appellate jurisdiction is here clearly drawn. The supreme court, as the head of the judicial system, was not made

the forum for general litigation. The protection and enforcement of rights, the prevention and redress of injuries and the punishment of crimes are committed to district and inferior courts of general jurisdiction, where all ordinary actions are to be initiated and determined. A few matters of great public importance and certain depredations upon personal liberty are cognizable in the first instance by the supreme court, through proceedings in quo warranto, mandamus, and habeas corpus. But even in such cases some special reason must exist for invoking its powers or parties will be relegated to a court of general jurisdiction for relief."

In *Wideman v. Faivre,* 100 Kan. 102, 107, 163 Pac. 619, it was said:

". . . This court has jurisdiction of a cause in one of two ways—by an invocation of its original constitutional jurisdiction in mandamus, quo warranto or habeas corpus, or through its appellate jurisdiction where it reviews alleged errors of trial courts. In the former we may glean the facts with the same freedom and liberality accorded to all trial courts. In the latter, when we sit to review the work of a trial court, we are limited to the record made in that court; and there would never be an end of litigation if first one party and then the other were permitted to pile up further evidence in the appellate court which was never submitted to the trial court or jury. The supreme court's jurisdiction is invariably and exclusively *original* or *appellate.* There is never a confusion or blending of both."

In *Mathewson v. Campbell,* 91 Kan. 625, 138 Pac. 637, relied upon to give this court jurisdiction, the court said: "In this case there was no oral evidence, and none that was conflicting." That the facts in the present case were in sharp dispute appears from the pleadings as quoted above. On this point the pleadings are to be considered. (*Brown v. Brown,* 146 Kan. 7, 11, 68 P. 2d 1105.) That the evidence was conflicting is frankly admitted in the majority opinion, where it is stated: "Each of these cases requires a finding of fact, sometimes on disputed evidence, before a conclusion can be reached. We have examined the record in each of these instances." (*Ante,* p. 372.)

How can this ruling be reconciled with the doctrine announced in nearly every volume of our reports that findings based on conflicting evidence will not be disturbed on appeal. It is not believed that *Mathewson v. Campbell* attempted to abrogate this rule. Appellant does not rely on the assignments of error, but blandly asks this court to try the case *de novo.* By the constitution this is an appellate court. No reason has been suggested why a contest case should be governed by a different rule. The constitution makes no exceptions.

In the case of *In re Burnette*, supra, it was said:

"It would be entirely impossible for a single supreme court to hear and decide controversies generally, arising within the state, upon their merits; and if any considerable number of them were to be heard anew little opportunity would remain for the performance of the true functions of an appellate court. Therefore, the constitution establishes a classification of its own, and in all except the extraordinary matters referred to, the power of the supreme court is limited to expounding the law and supervising the conduct of inferior tribunals by correcting errors in the decisions which they may promulgate." (p. 617.)

The wisdom of this passage is manifest when we consider the situation in the case before us. We are confronted with the transcript from the contest court, and with the pollbooks, tally sheets, etc. A mere perusal of these bulky documents would require one or two days; to study and analyze the manuscripts in the manner required to pass an intelligent opinion on the points raised would consume a number of days, perhaps six or seven days. As the documents are not printed, for each member of the court to study and digest the material would require, at the best estimate the writer can make, not less than thirty days. As this is utterly impossible, if other pressing business of the court is to have attention, it puts an unfair burden on the justice to whom the case is assigned. Out of sheer necessity he must master the details from an incoherent mass of materials, segregate the questions and submit them to the court in conference. To assert that this court can inspect this transcript and these exhibits as well as the trial court who has the benefit of the arguments of counsel is manifestly not true.

The rule that where a case comes before this court on written or documentary evidence as it was submitted in the trial court will decide for itself what the facts establish, when confined within reasonable bounds, promotes the administration of justice. But a line must be drawn. If pushed too far we perform the functions of a trial court. I think the judgment should be affirmed.