No. 38,999

CARL E. OLSON, JOE BLAINE, HURLEY BOHRER and FRED LUTHER, *Appellees*, v. CLARK M. FLEMING, N. H. PORTER, MARION E. RICHEY, LOUIS EDWARDS and LEE CLARK, as the District Board of Common School District No. 105, Neosho County, Kansas, and Common School District No. 105, Neosho County, Kansas, *Appellants*.

(254 P. 2d 835)

Opinion filed March 7, 1953.

*George W. Donaldson,* of Chanute, argued the cause and *Clark M. Fleming,* of Erie, was with him on the briefs for the appellants.

*Charles F. Forsyth,* of Erie, argued the cause and *Stanley E. Toland* and *J. D. Conderman,* both of Iola, were with him on the briefs for the appellees.

The opinion of the court was delivered by

SMITH, J.: This was an action pursuant to G. S. 1949, 60-1121, by taxpayers to enjoin a common school district board from entering into any contract, issuing any bonds or creating any tax or assessment under an election held pursuant to G. S. 1951 Supp. 72-2017. The defendants demurred to the petition on the ground it did not state facts sufficient to constitute a cause of action. This demurrer was overruled. The defendants have appealed.

The amended petition alleged that the plaintiffs were resident taxpayers and qualified electors of Common School District No. 105, Neosho county, and they each owned property located within the district which was subject to taxation for the benefit of the district; that the members of the board of that district and the district itself was duly organized; that prior to September 16, 1952, the district board called an election for the purpose of submitting a proposition as follows:

"Shall Common School District No. 105, Neosho County, Kansas, issue bonds of said District in the sum and amount of Two Hundred Ninety Thousand ($290,000.00) Dollars, for the purpose of purchasing and improving

a site and the construction, furnishing and equipping of a schoolhouse and other necessary buildings, to provide classroom, auditorium and physical education facilities for said School District?"

The amended petition alleged further that the count of votes cast showed 395 votes in favor of the proposition and 386 against; that the district board after a canvass purportedly found there were 395 "Yes" as against 386 "No"; that they declared the proposition had carried and that they were authorized to proceed to carry out the building program. The amended petition then alleged that ten of the persons who voted at the election were disqualified in that they were not duly qualified electors of the district. The names and poll book members of the persons who were disqualified were set out. The amended petition then alleged that none of such persons were challenged by the election judges when they voted and their ballots were not kept separate and could not be separated and identified from the other ballots cast at the election; that these ten votes were enough to change the result of the election; that by reason of the ten illegal votes it had not been shown that a majority of the qualified electors voting on the proposition voted in favor of the issuance of the bonds; that the issuance of the bonds was, therefore, unlawful and not authorized by G. S. 1951 Supp. 72-2017, and 2018, under which the election was held; that a legal election could easily be obtained to ascertain the mandate of the qualified electors; that the plaintiffs will suffer irreparable injury in their tax burden should the board proceed with the proposed construction program; that the plaintiffs had no adequate remedy at law; that the court with its equitable powers should permanently enjoin the defendants from entering into any contract, issuing or selling any bonds, making any tax levy or assessment or in any way proceeding with the proposed construction program under the purported authorization of the above mentioned September 16, 1952, election and demand that this be done. The prayer was for judgment that the election of September 16, 1952, did not authorize the defendants to proceed with the construction program; that the court permanently enjoin and restrain defendants from entering into any contract, issuing or selling any bonds or creating any tax or assessment or in any manner proceeding further under the purported authorization of the election.

The defendants demurred to this petition on the ground that it did not state facts sufficient to constitute a cause of action in favor

of the plaintiffs and against the defendants. This demurrer was overruled—hence this appeal.

At the argument on this demurrer in response to a question from the court counsel for plaintiffs stated:

"That there was not enough legal voters at the time of the election to authorize the school board to go ahead. There is no question about the honesty of the judges or the clerks. We are questioning the election merely on the basis as stated in our petition, that ten persons were not qualified, they were not duly qualified voters. By their demurrer the defendants admit that there were ten unqualified electors voting in the school election and that their votes were counted, that is admitted for the purpose of this demurrer."

The question involved is stated as follows:

"Specifically, the issue is whether a petition is sufficient which simply alleges that in a bond election where the canvass shows a majority of nine votes in favor of the proposition there were ten illegal votes cast, without any allegation of how the illegal votes were cast or that if the poll were purged of the illegal votes the result of the election would be changed."

Plaintiffs argue that this is not an election contest but an equity action authorized by G. S. 1949, 60-1121, to enjoin the defendants from entering into a contract which will result in the creation of an illegal tax on plaintiffs' property. They state the right to so proceed was recognized in *Abrahams v. School District*, 97 Kan. 325, 155 Pac. 16. It is true, that case does state the remedy provided in the above section is available to plaintiffs. The opinion, however, demonstrates that the ballots at such an election may be preserved and when so preserved may be the best evidence as to how the persons casting them voted. The opinion is actually authority for an argument that votes of illegal voters should have been challenged when they were voting so that an allegation could be made and proof had as to whether these illegal votes were on one side or the other of the proposition. From anything that appears in this petition the illegal votes may have all been against the proposition.

Plaintiffs rely on something that was said in *A. T. & Santa Fé Rld. Co. v. Comm'rs of Jefferson Co.*, 17 Kan. 29, to support their argument that the entire election must be set aside when there have been illegal votes cast. This case does not support that argument. It is true this court did say after considering the entire election:

"We are convinced that there were more than enough illegal votes polled at Grasshopper Falls to have changed the result."

An examination of the entire opinion, however, discloses that the parties who were contesting the election alleged

"More than a hundred illegal and spurious votes were cast in favor of the proposition."

The opinion deals with a factual question whether that allegation was sustained. The entire vote of the county was 862 in favor and 766 against, or a majority of 96. The vote from Grasshopper Falls was 447 for and 8 against. When the court had concluded as a factual matter that 194 illegal votes voted at Grasshopper Falls and 24 legal votes were against, the court made the above statement. The opinion actually was devoted to demonstrating that the defendants had proved the allegation in their answer heretofore referred to.

We are unable to discern wherein the rule to be applied differs from that applied in *Campbell v. Ramsey*, 150 Kan. 368, 92 P. 2d 819. That was an election contest case but we said in discussing:

"Since the trial court found that these eighteen had no right to vote in East Marion it was necessary to ascertain for which candidate each one voted. The practice followed at the trial before the contest court was to call each one of the voters before the court, then ascertain whether he was a legal voter, and if it was determined that he was not a legal voter then whether he voted for either one of the candidates for county commissioner, and if the voter answered in the affirmative then to ascertain for which candidate he voted."

Such a proceeding could have been followed in this case. The petition could have alleged that ten illegal votes were cast and that enough of them were cast in favor of the proposition to change the result. The proof of that allegation would then have been by means of the so-called illegal voters. Their testimony is available. Plaintiffs seem to recognize this, but argue that such should not be the rule since the temptation to testify falsely would be so great that one of the illegal voters by so testifying falsely could control the result of the election. The temptation in such a case would not be any greater than in other cases where the outcome of trials depend on testimony of witnesses.

In *Tarbox v. Sughrue*, 36 Kan. 225, 12 Pac. 935, we said:

"It has always been held, and is not disputed, that illegal votes do not avoid an election unless it can be shown that their reception affects the result; and where the illegality consists in the casting of votes by persons unqualified, unless it is shown for whom they voted it cannot be allowed to change the result."

This has never been overruled. It is still the law.

Plaintiffs argue there is a distinction between bond issues such as this and elections where the title to an office is at stake. We do not recognize this distinction.

The judgment of the trial court is reversed with directions to sustain the demurrer.