NOT DESIGNATED FOR PUBLICATION

No. 120,145

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

HAROLD JOHNSON,
*Appellant*,

v.

BOARD OF DIRECTORS OF FOREST LAKES
MASTER ASSOCIATION,
*Appellee*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; ERIC A. COMMER, judge. Opinion filed December 27, 2019. Reversed and remanded with directions.

*Michael R. Andrusak*, of Adams Jones Law Firm, P.A., of Wichita, for appellant.

*T. Chet Compton*, of Fleeson, Gooing, Coulson & Kitch, L.L.C., of Wichita, for appellee.

Before GREEN, P.J., BRUNS, J., and WALKER, S.J.

PER CURIAM: This is a summary judgment case involving the validity of an amendment passed by the Board of Directors of Forest Lakes Master Association homeowners association. On appeal, Harold Johnson contends that the trial court wrongly determined that he lacked common-law standing to sue the Board. Next, Johnson argues that the Board violated the election rules in the Association's Declaration of Covenants and Bylaws when it passed an amendment that changed the declaration's voting procedures. Based on those violations, he asserts that the voting procedure amendment, which the Board enacted, is invalid. Johnson then asserts that a later general amendment

1

to the Association's declaration is invalid because the Board used the procedures in the invalid voting procedure amendment to pass it. Johnson also argues that the trial court erred by granting the Board's request for attorney fees amounting to $50,000 and denying his request for attorney fees. In addition, Johnson argues that we should grant his out-of-time request for appellate attorney fees.

On the other hand, the Board argues that each of the trial court's rulings were proper. Moreover, the Board asks that this court grant its request for appellate attorney fees for $17,977.50.

Nevertheless, for the reason stated later, we conclude that Johnson established he has common-law standing to sue. Furthermore, we conclude that the trial court misinterpreted the Association's declaration and bylaws when it granted the Board's summary judgment motion. Therefore, we reverse the trial court's order granting summary judgment in favor of the Board and direct the trial court to grant summary judgment in favor of Johnson. Last, we conclude that neither party is entitled to any attorney fees. As a result, we reverse the trial court's order requiring Johnson to pay the Board $50,000 in attorney fees while rejecting Johnson's and the Board's other requests for attorney fees. Accordingly, we reverse and remand with directions.

*Facts and Procedural Background*

Johnson is a member of the Forest Lakes Master Association. On September 15, 2015, the Association's Board of Directors distributed a circular stating that at the annual members' meeting on November 9, 2015, it would hold a vote to amend the voting procedures in the Association's Declaration of Covenants. In the circular, the Board explained that under the current rules "it [took] 2/3's approval . . . of all 27[7] association homes" to pass an amendment. But it explained that generally, less than two-thirds of the Association members attended and voted at meetings. This meant that the Board almost

2

never had enough members present to pass proposed amendments. The Board proposed amending the declaration to require "[two-thirds] approval . . . of at least a 25% quorum." The Board further explained that "[a]fter reviewing [the Bylaws] with an attorney" a "20% quorum [was] by law . . . the minimum quorum."

The Board requested that all members either vote in person or "send someone to vote for you in person with [a] proxy/ballot form." Yet, the Board explained that if it did "not get a 2/3s vote for either 'yes' or 'no'" at the meeting, the Board of Directors would go door to door collecting ballots during the 30 days following the meeting.

Under Declaration Section 1.05, each lot received two votes; this was the case regardless of how many persons were listed on the lot's deed. Because the Association had 277 lots, the Board could receive a maximum of 554 votes. Declaration Section 11.03b stated that the Board needed at least two-thirds of all 554 votes in favor of the amendment to pass the amendment. This meant that the Board needed 370 affirmative votes to pass an amendment to the declaration. Declaration Section 11.03b further provided that votes to amend the declaration "may be cast in person or by proxy as provided for herein and the bylaws of the Association." Declaration Section 1.08, which involved general voting rules, stated that written assents collected 30 days after a meeting may be counted toward the vote of "the specified majority."

At the November 9, 2015 meeting, the Board had a sign-in sheet. A little over 50 people signed this sheet. The Board's minutes stated that about "50 homeowners" attended the meeting. The Board combined the ballots of people who voted at the meeting with the "proxy/ballots" votes. At the end of the meeting, the Board concluded it did not have enough votes to pass the 2015 voting procedure amendment. As a result, the Board of Directors began going door to door to collect affirmative votes.

3

On December 14, 2015, the Board determined that it had enough votes to amend the declaration's voting procedures. On December 22, 2015, the Board recorded the amendment with the county register of deeds.

In May 2016, Johnson, who voted against the voting procedure amendment, e-mailed HOA Management Services—the Association's management company—who also counted the voting procedure amendment ballots. Johnson's e-mail concerned the validity of the voting procedure amendment. Johnson believed that the Board miscalculated the vote. The HOA manager initially responded that she recounted the vote, and that the Board had received 361 affirmative votes. She stated that "the HOA needed 282.5 yes votes" to pass. After learning that the Board received only 361 votes, Johnson contacted the Board about the Board receiving less than 370 affirmative votes. About 10 days later, the HOA manager e-mailed Johnson again. She then stated in the e-mail that the Board had received 392 votes because she had wrongly omitted votes from members who had not paid their dues. She alleged that "all the votes [the Board received] were valid."

On June 10, 2016, Johnson e-mailed the Board that he believed it failed to follow proper voting procedures while collecting and tallying ballots for the voting procedure amendment. Johnson noted that under Declaration Section 11.03b, an amendment required members to cast votes either in person or by proxy. Johnson alleged that the Board wrongly collected ballots after the meeting because Declaration Section 1.08, which allows members to cast votes by written assent after the meeting, did not override Section 11.03b's language about casting votes in person or by proxy.

Johnson requested to review the ballots that were cast. Johnson also asked the Board to take "corrective action," otherwise he would sue. The Board eventually granted Johnson's request to review the ballots. Johnson's review of the ballots confirmed his belief that the Board had violated its voting procedures to pass the voting procedure

4

amendment. When the Board refused to find the voting procedure amendment void, Johnson filed suit.

In his suit, Johnson asked the trial court for a declaratory judgment on the validity of the Board's 2015 voting procedure amendment. Johnson argued that the voting procedure amendment was void for two reasons. First, he argued that the Board never received affirmative votes from two-thirds of its members. In support of this argument, he alleged that the Board counted unsigned and undated votes, double-cast votes, and votes of nonmembers. He further alleged that the Board wrongly collected votes after the 2015 annual members' meeting where members voted on the voting procedure amendment. Second, he argued that the Board failed to have a quorum at the 2015 annual members' meeting in violation of Section 3.04 of the Association's bylaws. Johnson argued that at least 20 percent of the Association members needed to attend the annual members' meeting for a quorum to exist. Johnson also argued that the Board's 2016 general amendment to the declaration was invalid because the Board used the voting procedure from the 2015 amendment to pass it.

Johnson asserted that the voting procedure amendment harmed him because it "substantially reduce[d] the number of votes required for future amendments . . . ." Moreover, he asserted that his attorney fees incurred while suing the Board constituted damages. As a result, Johnson requested that the trial court order the Board to "rescind the 2015 Amendment and 2016 [A]mendment" to the declaration.

The Board responded that Johnson misinterpreted the Association's declaration and bylaws. The Board denied miscounting the ballots for the 2015 voting procedure amendment. The Board explained that "the ballots and written assents forming the basis for its December 14, 2015 certification [were] valid and binding." The Board argued that it had a quorum as required under Bylaw Section 3.04 based on "the presence of members entitled to vote at the [November 2015] meeting." Then, the Board requested

5

that the trial court deny Johnson's request for attorney fees while granting its request for attorney fees.

Eventually, both parties moved for summary judgment. Johnson continued to assert that the Board had failed to follow the Association's declaration and bylaws during the voting procedure amendment election in the following ways: First, Johnson argued that all the ballots collected outside the meeting by written assent were invalid. Johnson noted that under Declaration Section 11.03b, the Association could amend the declaration by "votes . . . cast in person or by proxy." Based on this language, Johnson argued that the Board could not use Declaration Section 1.08c to collect ballots by written assent up to 30 days after the annual members' meeting where members voted on the 2015 voting procedure amendment. In turn, Johnson asserted that the voting procedure amendment was invalid because the Board had failed to receive the requisite 370 votes approving the amendment by the end of the 2015 annual members' meeting.

Second, Johnson argued that Bylaw Section 3.04 on quorum was ambiguous because the first and the second sentence of the provision conflicted with one another. Johnson asserted that it was unclear how many people needed to cast votes either at the meeting or by proxy to constitute a quorum. Based on this ambiguity, Johnson asserted that the trial court should rely on K.S.A. 2015 Supp. 58-4613(a) of the Kansas Uniform Common Interest Owners Bill of Rights Act. This Act states that a quorum constitutes 20 percent of the votes within an association.

Third, Johnson argued that notwithstanding his other arguments, the Board had miscalculated the total vote count because it "add[ed] more than 60 votes to its tally by counting individual ballots twice." The ballots produced during discovery establish that sometimes a member would cast two ballots, but other times a member would cast a single ballot. Johnson argued that the Board wrongly counted a single ballot cast by a member as two votes to boost its overall vote count.

6

Fourth, Johnson argued that the 2016 general amendment was invalid because the 2015 voting procedure amendment was invalid. Johnson asserted that during the 2016 general amendment election, the Board needed to use the voting procedures in place before the Board amended the declaration with the 2015 voting procedure amendment. Johnson argued that because the Board received only 65 votes during the 2016 general amendment election, the Board failed to receive 370 affirmative votes as required under Declaration Section 11.03b.

The Board responded that the trial court should deny Johnson's motion for summary judgment. The Board asserted that Johnson misinterpreted the provisions of the declaration and bylaws. Regarding Johnson's argument that it wrongly counted ballots obtained by written assent, the Board asserted that Declaration Section 11.03b did not conflict with Declaration Section 1.08c because Section 11.03b "incorporate[d] Section 1.08 by implicit reference" by stating that "votes may be cast in person or by proxy *as provided for herein and in the bylaws of the Association*." According to the Board, collecting ballots by written assent up to 30 days after the meeting was another method "as provided for [in the declaration] and in the bylaws of the Association."

Regarding Johnson's argument about the quorum, the Board alleged that "the Bylaws [were] clear." The Board asserted that "the only reasonable interpretation of Section 3.04['s first sentence was] that it requires at least *one* member to be present at the meeting to constitute a quorum." The Board recognized that Section 3.04's second sentence discussed situations where members may adjourn a meeting when there is no quorum present. Even so, the Board argued that the two sentences did not conflict by interpreting the language "except as otherwise provided in the Articles of Incorporation, the Declaration, or these Bylaws" in the first sentence as creating a "contingency" for future amendments that might change the quorum requirement.

7

As for Johnson's argument that the Board miscounted votes, the Board alleged that it could count a single ballot cast by a member as two votes because under Declaration Section 1.05, every lot had two votes. Further, the Board now alleged that it received a total of 417 votes in favor of the 2015 voting procedure amendment, receiving 149 votes "at the meeting" and 268 votes "after the meeting." This assertion differed from the Board's interrogatory response filed just 3 months earlier, in which the Board stated that it collected 153 affirmative votes at the meeting and a total of 411 affirmative votes.

Last, the Board asserted that because the 2015 voting procedure amendment was valid, Johnson's argument about the 2016 general amendment's invalidity necessarily failed.

Next, the Board moved for summary judgment against Johnson. The Board argued that Johnson lacked statutory and common-law standing. Concerning common-law standing, the Board argued that Johnson had not suffered a cognizable injury that was causally connected to the enactment of the voting procedure amendment. Then, the Board argued that the trial court should grant its summary judgment motion for the same reasons why the trial court should deny Johnson's summary judgment motion. The Board concluded that the trial court should order Johnson to pay its attorney fees totaling $54,280.10 plus interest because Johnson's "perversion of the Act ha[d] forced the Board to direct its time and the [A]ssociation's valuable resources . . . to defending its lawful conduct."

Johnson responded that he had standing because he was "seek[ing] to enforce the rules and procedures . . . in the Bylaws and Declaration," which he believed the Board had violated. He argued that the Board was not entitled to attorney fees because he brought his suit in good faith. He also argued that the amount of attorney fees the Board requested was unreasonable. Johnson also responded that the trial court should deny the Board's summary judgment motion for the same reasons it should grant his motion.

8

The trial court held a hearing on the parties' summary judgment motions. At the beginning of the hearing, the trial court stated that it had not reviewed all the documents filed in the case. The trial court continued that it "doubt[ed] judges review every single page that is—don't commonly review every single page of all of the exhibits submitted . . . ." Later, the trial court also admitted that it had not counted the ballots.

After the parties presented their arguments, the trial court granted the Board's motion for summary judgment from the bench. Except for the Board's argument that Johnson lacked statutory standing, the trial court adopted each of the Board's arguments. The trial court ruled that Johnson lacked common-law standing because he had not suffered a cognizable injury. The trial court then ruled that Johnson had misinterpreted the Association's declaration and bylaws in making his arguments. Next, the trial court concluded that the Board had received the requisite affirmative votes to pass the amendment: "whether it was 380 or 403 or 411 or 417 [votes]." Last, the trial court determined that the Board was entitled to attorney fees in the amount of $50,000, which would accrue interest from the date it filed the journal entry. The trial court ordered the Board to write the journal entry of judgment and submit it to the trial court for its signature.

Johnson timely appealed.

*Does Johnson Have Standing?*

The trial court ruled that Johnson had statutory standing but lacked common-law standing. It ruled that Johnson suffered no cognizable injury.

On appeal, Johnson challenges this ruling, arguing that he did not need to suffer a distinct and separate injury to establish common-law standing. Instead, he just needed to show that he suffered a cognizable injury. Johnson argues that since the Board is using an invalid amendment while conducting meetings, there is a "cloud" over his title.

On the other hand, the Board argues that Johnson misconstrued the trial court's rulings. It asserts that the trial court rejected the argument that Johnson needed to suffer an injury separate and distinct from other Association members. Rather, the trial court ruled that Johnson lacked standing because he had suffered no cognizable injury. The Board argues that Johnson's cloud over his title argument is made for the first time on appeal and without supporting authority. Alternatively, the Board argues that the trial court correctly ruled that Johnson suffered no cognizable injury because the 2015 voting procedure amendment and 2016 general amendment did not create a cloud on his title.

We initially note that the only statement the trial court made when ruling that Johnson lacked common-law standing was that he had not suffered a "cognizable injury." There was no discussion about his failure to suffer an injury separate and distinct from other Association members in respect to whether he had common-law standing. Thus, the Board correctly argues that the trial court did not rule that Johnson lacked common-law standing for this reason.

*Applicable Law*

"'"Standing is 'a party's right to make a legal claim or seek judicial enforcement of a duty or right.'"'" *Board of Johnson County Comm'rs v. Jordan*, 303 Kan. 844, 854, 370 P.3d 1170 (2016). Moreover, "[s]tanding is a jurisdictional question in which courts determine whether a party has alleged a sufficient stake in the outcome of a controversy to warrant invocation of jurisdiction and to justify exercise of the court's remedial powers on that party's behalf." 303 Kan. at 854.

10

Plaintiffs must have statutory and common-law standing to sue. *Sierra Club v. Moser*, 298 Kan. 22, 29, 310 P.3d 360 (2013). "[T]o demonstrate common-law or traditional standing, a person suing individually must show a cognizable injury and establish a causal connection between the injury and the challenged conduct." 298 Kan. at 33. Plaintiffs establish that they have a "cognizable injury" when plaintiffs show that they have "a personal interest in the court's decision and . . . personally suffer[] some actual or threatened injury as a result of the challenged conduct." *Board of Johnson County Comm'rs*, 303 Kan. at 854.

Appellate courts exercise unlimited review when considering if a plaintiff has standing. *Solomon v. State*, 303 Kan. 512, 519, 364 P.3d 536 (2015).

*Common-Law Standing Exists*

The Board argues that this court should reject Johnson's common-law standing argument because he never asserted that the amendments created a cloud on his title before the trial court. The Board contends that in the trial court proceedings, Johnson asserted that the only injuries he suffered involved the attorney fees he paid during litigation. In his reply brief, Johnson argues that the Board's contention is false because in his petition, he made the following allegation: "Plaintiff has been harmed by the certification and recording of the invalid 2015 Amendment and 2016 Amendment to the Declaration, which amendments, among other changes, substantially reduce the number of votes required for future amendments to the Declaration."

Although Johnson never used the language "cloud on [his] title" before the trial court, his argument that the amendments placed a cloud on his title relate to the arguments he made in his petition. In short, Johnson argues that the invalid amendments adversely affected him because the Board failed to follow the Association's election

11

procedures contained in the declaration and bylaws. Thus, the invalid amendments created a cloud on his title because the Board imposed rules he asserts it had no authority to impose. As a result, it is currently unclear whether he is contractually bound by the 2015 voting procedure amendment or the 2016 general amendment.

Moreover, Johnson's argument hinges on the validity of the votes made during the voting procedure amendment election. Accordingly, it is readily apparent that if the Board failed to follow proper procedures during its election, the Board's actions invalidated his votes against the amendments. In turn, passing an amendment Johnson opposed without the adequate votes to pass it would have constituted a cognizable injury. Thus, despite the Board's argument to the contrary, Johnson has consistently argued that he suffered a cognizable injury.

In addition, it is unclear why the Board alleges that Johnson failed to cite authority to support his argument. Johnson cited our Supreme Court's rules on common-law standing. He then made an argument why he had common-law standing by explaining how the Board's actions adversely affected him. Accordingly, the Board's argument that Johnson failed to support his argument with pertinent authority falls short of the mark.

In summary, Johnson established that he had an interest in the court's decision because he personally suffered as a result of the Board's allegedly invalid elections. Undoubtedly, the Board's alleged failure to follow proper election procedure has a causal connection to the cloud on Johnson's title because no such cloud would exist but for the Board's actions. Therefore, Johnson has common-law standing, and the trial court erred by holding otherwise.

*Did the Trial Court Err by Granting the Board's Motion for Summary Judgment?*

Next, Johnson argues that the trial court erred by granting the Board's motion for summary judgment. Moreover, Johnson argues that as a matter of law, the trial court should have granted his motion for summary judgment. Johnson contends that under the uncontroverted facts, it is clear that the Board failed to comply with Declaration Section 11.03b—the provision on amending the declaration—and comply with Bylaw Section 3.04—the provision on quorum. Johnson argues that as a result, the 2015 voting procedure amendment was invalid. He further argues that the 2016 general amendment is invalid because the Board used the invalid 2015 voting procedure amendment when it passed the general amendment. Alternatively, Johnson argues that this court should reverse and remand to the trial court because the trial court never considered his argument about the Board failing to obtain the requisite number of votes to pass the 2015 voting procedure amendment.

Relying on the arguments it made to the trial court, the Board counters that all of Johnson's arguments are meritless.

*Applicable Law*

""'Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"" *Patterson v. Cowley County, Kansas*, 307 Kan. 616, 621, 413 P.3d 432 (2018). When considering a summary judgment motion, a trial court must resolve all facts and inferences in favor of the nonmoving party. 307 Kan. at 621. But the nonmoving party ""'must come forward with evidence to establish a dispute as to a material fact.'"" 307 Kan. at 621.

13

While exercising de novo review, appellate courts apply the same standard as the trial court when reviewing the trial court's summary judgment decision. *Patterson*, 307 Kan. at 621; *Siruta v. Siruta*, 301 Kan. 757, 766, 348 P.3d 549 (2015).

To the extent this case involves construction of the Association's declaration and bylaws, "'[t]he rules governing the construction of covenants imposing restrictions on the use of realty are the same as those applicable to any contract or covenant . . . .' [Citation omitted.]" *South Shore Homes Ass'n v. Holland Holiday's*, 219 Kan. 744, 751, 549 P.2d 1035 (1976). When interpreting contracts, this court must endeavor to ascertain the parties' written intent. If the parties' intent is clear, then this court will not apply the canons of contract construction. *Stechschulte v. Jennings*, 297 Kan. 2, 15, 298 P.3d 1083 (2013). "'"[R]easonable rather than unreasonable interpretations are favored by the law. Results which vitiate the purpose or reduce the terms of the contract to an absurdity should be avoided."'" *In re Estate of Einsel*, 304 Kan. 567, 581, 374 P.3d 612 (2016). Moreover, courts should consider all relevant parts of a contract when determining a provision's meaning. In other words, courts should not analyze a provision in isolation. 304 Kan. at 581.

When engaging in this construction, appellate courts exercise de novo review. *Prairie Land Elec. Co-op v. Kansas Elec. Power Co-op*, 299 Kan. 360, 366, 323 P.3d 1270 (2014). Appellate courts also exercise de novo review when considering whether contractual language is ambiguous. See *Waste Connections of Kansas, Inc. v. Ritchie Corp.*, 296 Kan. 943, 964, 298 P.3d 250 (2013).

Last, it is worth noting that the declarant, Marvin Schellenberg, filed the Association's declaration and bylaws with the county register of deeds in 1993 and 1994, respectively. Although the declarant filed the declaration and bylaws before the 2010 enactment of the Kansas Uniform Common Interest Owners Bill of Rights Act, the Act supplements the Association's declaration and bylaws. K.S.A. 2018 Supp. 58-4606(a)

14

provides that the Act "appl[ies] to all common interest communities that contain 12 or more units that may be used for residential purposes created in this state before the effective date of this act."

*Post Meeting Votes Invalid*

Having addressed the applicable law, we now turn to Johnson's individual arguments. Johnson first argues that the trial court erred by ruling that the votes the Board collected after the 2015 annual members' meeting were valid. Johnson's argument involves the interpretation of Declaration Sections 1.08 and 11.03 and Bylaw Section 3.05.

Declaration Sections 1.08 and 11.03 read as follows:

"Section 1.08. Approval by Members. Any provision of this Declaration or the Bylaws which requires the vote or written assent of a specified majority of the voting power of the associations shall be deemed satisfied by the following:

a. The vote of the specified majority at a meeting duly called and noticed pursuant to the provisions of the applicable Bylaws;

b. A writing or writings signed by the specified majority; or

c. A combination of votes or written assent, provided that Members shall not change their vote or written assent after it is cast or delivered, and provided further that only those written assents executed within sixty (60) days before or thirty (30) days after a meeting may be combined with votes cast at such meeting to constitute the specified majority.

. . . .

"Section 11.03. Amendment; Other. Amendments to this Declaration . . . shall be proposed and adopted in the following manner:

a. Notice. Notice of the subject matter of the proposed amendment shall be included in the notice of any meeting of the Association at which a proposed amendment shall be considered.

15

b. Resolution. A resolution adopting a proposed amendment may be proposed by either the Board or by the membership of the Association. Unless otherwise specified in this Declaration, such proposed amendment must be approved by the owners of not less than two-thirds of the votes in the addition. Such votes may be cast in person or by proxy as provided for herein and in the bylaws of the Association."

Meanwhile, Bylaw Section 3.05, the provision on proxy, reads as follows:

"Section 3.05. Proxies. At all meetings of Members, each member may vote in person or by proxy. All proxies shall be in writing and filed with the Secretary prior to the commencement of such meeting. Every proxy shall be revocable and shall automatically cease upon conveyance by the member of his Lot."

The trial court adopted the Board's argument on the post meeting votes. The trial court determined that the Board could rely on Declaration Section 1.08c's general voting rules during the 2015 voting procedure amendment election because Declaration Section 1.08c and Declaration Section 11.03b could be read together without conflict. The trial court ruled that "in person" as stated in Declaration Section 11.03b did not mean "in person at a meeting" because 11.03b did not mention "a meeting." Instead, the Board could collect votes "in person" as stated under Declaration Section 1.08c, both 60 days before the annual members' meeting and up to 30 days after the annual members' meeting. The trial court concluded that Declaration Section 1.08 involved the timing of votes, while Section 11.03b involved the methods of voting.

On appeal, the Board contends that the trial court correctly interpreted Declaration Sections 1.08c and 11.03b. Before the trial court, the Board stressed that under Declaration Section 11.03b, the term "in person" does not explicitly state "in person at a meeting." The Board also stressed before the trial court that under Declaration Section 11.03b, there are two methods of voting, "in person" or "by proxy." According to the Board, Declaration Section 1.08 explains "more specifically" that votes "in person" or

16

"by proxy" "may be cast at a time other than the meeting." Thus, the Board argues that it could collect votes "in person" either 60 days before the meeting or up to 30 days after the meeting.

Johnson, on the other hand, argues that Declaration Sections 1.08c and 11.03b cannot be read together. He argues that Section 11.03b is more specific as it involves amendments to the declaration. He then contends that under the more specific Section 11.03b, it is clear that votes for an amendment must be cast "in person *at a meeting*" or "by proxy." He contends that Section 1.08c does not apply when the Board seeks to amend the declaration because Section 1.08c involves the approval of a measure by written assent, which is different than collecting votes "in person" or "by proxy."

Johnson contends that there is no provision under the declaration or bylaws allowing the Board to collect votes door-to-door after the annual members' meeting. Thus, Johnson argues that all the votes the Board collected after the 2015 annual members' meeting were invalid. Because it is uncontroverted that the Board did not have 370 votes approving the 2015 voting procedure amendment at the conclusion of the annual members' meeting, Johnson argues that the voting procedure amendment is invalid.

Thus, the parties' dispute hinges on the meaning of the following sentence under Declaration Section 11.03b:  "Such votes may be cast in person or by proxy as provided for herein and in the bylaws of the Association." Specifically, the parties have different interpretations of the term "in person." To understand the meaning of the term "in person" under Section 11.03b, we must first consider the Association's other methods of voting.

The parties agree that under Declaration Section 11.03b, the Board may receive proxy votes. Bylaw Section 3.05 states that "[a]ll proxies shall be in writing and filed with the Secretary prior to the commencement of such meeting." Thus, we know that

17

proxies must be filed before an annual members' meeting. Outside of the preceding language, however, the Association's declaration and bylaws do not define "proxy."

Nevertheless, in its brief, the Board explains how it interprets proxy. The Board explains that when someone has signed a proxy that person has "designated someone to cast [a vote] for them." The Board also cites Black's Law Dictionary's definition of proxy:  "Someone who is authorized to act as a substitute for another" or "[t]he grant of authority by which a person is so authorized." Black's Law Dictionary 1482 (11th ed. 2019). Accordingly, the Board interprets proxy as the word is generally understood. When individuals vote by proxy, they designate someone who is authorized to cast a vote for them. The Board's construction is consistent with our standard of interpreting contractual provisions in a reasonable manner. *In re Estate of Einsel*, 304 Kan. at 581.

Next, Declaration Section 1.08 addresses approval by written assent. Section 1.08b states that approval by written assent involves "[a] writing or writings signed by the specified majority." Section 1.08c provides that the Board can collect approval by written assent 60 days before or up to 30 days after a meeting where the vote occurred.

Based on the language of Declaration Section 1.08c, it is readily apparent that voting by proxy and approval by written assent are two different methods of voting. When members sign proxies, they designate someone else to cast their vote for them. Yet, members approving by written assent personally create a written document approving of a proposed action. There is no designation. Furthermore, members signing proxies must have their proxy on file with the secretary before the meeting where the Association members consider the proposed action. Yet, members approving by written assent may do so 60 days before or up to 30 days after the meeting where the vote occurred.

Having explained the difference between voting by proxy and approval by written assent, we turn now to the meaning of voting "in person." The term "in person" is not explicitly defined under the Association's declaration or bylaws. Even so, we know that voting "in person" differs from voting "by proxy" because the plain language of Declaration Section 11.03b treats the types of votes differently:  "Such votes may be cast *in person or by proxy* as provided for herein and in the bylaws of the Association." This a true disjunctive proposition. This sentence expresses a choice or an alternative between two things which cannot both be the case. For example, if members cast their votes "in person," those members have not designated their votes to someone else to cast for them as is required to vote "by proxy."

The Board agrees that voting in person and by proxy are distinct methods of voting. But the Board argues that members may vote "in person" 60 days before or up to 30 days after a meeting based on Declaration Section 1.08c's language. To make this argument, the Board relies on Declaration Section 11.03b's language as follows:  "Such votes may be cast in person or by proxy *as provided for herein and in the bylaws of the Association.*" (Emphasis added.) The Board contends that this italicized language proves that other provisions, like Declaration Section 1.08's general voting procedures, may modify the Association's voting procedures for amending the declaration. Then, the Board contends that it "properly used the procedure under 1.08[c], combining votes collected within 60 days before the meeting and 30 days after the meeting with those cast at the meeting in order to determine whether the requisite number of affirmative votes had been cast to approve the 2015 Amendment." Nevertheless, there are significant problems with the Board's interpretation.

First, the Board's argument that the term "in person" under Section 11.03b could include the votes they collected door to door after the 2015 annual members' meeting ignores the plain language of Declaration Section 11.03, which establishes that votes "in person" are votes cast "in person at a meeting." Declaration Section 11.03a states that the

19

Board must give notice of any proposed amendment "in the notice of *any meeting* of the Association at which a proposed amendment shall be considered." (Emphasis added.) Thus, Section 11.03a establishes that the Board must hold a meeting where members shall consider the proposed amendment. Declaration Section 11.03b continues, stating (1) that the proposed amendment may be proposed by the Board or members; (2) that the Association needs a two-thirds majority to pass the amendment; and (3) that "[s]uch votes may be cast in person or by proxy."

As previously noted, when interpreting contracts, we must consider all relevant parts of the contract together. We must refrain from interpreting provisions of a contract in isolation. Moreover, we must seek to interpret the contract in a reasonable manner. *In re Estate of Einsel*, 304 Kan. at 581. Here, when we consider Declaration Sections 11.03a and 11.03b together, it is readily apparent that the term "in person" in Section 11.03b means "in person at a meeting." Section 11.03a mandates that a meeting occurs where the members consider the proposed amendment. Thus, when we consider the meaning of Section 11.03b's language that "[s]uch votes may be cast in person or by proxy," we do so with the knowledge that Section 11.03a mandates a meeting where the members consider the proposed amendment.

Moreover, the purpose of a proxy is so members who cannot attend the meeting may still cast a vote; thus, proxy votes are necessarily cast at a meeting. In turn, a reasonable interpretation of Section 11.03b's language that "[s]uch votes may be cast in person" is that members may vote for the proposed amendment "in person or by proxy at a meeting."

Second, the Board's interpretation of Declaration Section 11.03b violates the doctrine of the last antecedent. For example, the Board argues that Section 11.03b's language—"[s]uch votes may be cast in person or by proxy *as provided herein and in the bylaws of the Association*"— means that other provisions of the declaration and bylaws

20

may modify the meaning of "in person." In making its argument, however, the Board ignores that the language "or by proxy" is between the language "in person" and "as provided for herein and in the bylaws of the Association." "[U]nder the last antecedent doctrine, relative or modifying phrases are to be applied to the words immediately preceding them and are not to be construed as extending to remote phrases." *The Salina Journal v. Brownback*, 54 Kan. App. 2d 1, 16, 394 P.3d 134 (2017).

Here, the last antecedent phrase "or by proxy" is modified by the language "as provided for herein and in the bylaws of the Association." Nothing supports that the language "as provided for herein and in the bylaws of the Association" modifies the first antecedent "in person." As previously pointed out, no other provision in the Association's declaration or bylaws addresses the meaning of "in person." But Bylaw Section 3.05 addresses the meaning of "proxy." Consequently, the last antecedent doctrine is borne out by the lack of provision on "in person" and the existence of a provision on proxy voting in the other declaration and bylaw provisions.

Third, if we were to accept the Board's interpretation, we would render parts of the declaration meaningless. The Board asks us to interpret Declaration Section 11.03b in a manner that allows the Board to collect votes door to door "in person" instead of "in person at a meeting." Yet, if we were to construe Section 11.03b in this way, what would be the point of proxy votes?

The declaration states only the voting interests present in person or by proxy shall be counted. Thus, the declaration does not provide for written assents to be construed either as proxies or for amending the declaration. If the Board's argued method for determining an amendment is correct, no lot owner would bother with finding a proxy if a written assent would suffice.

21

"A contract should not be interpreted in a manner which renders a term of the contract meaningless." *Guss v. Fort Hays State Univ.*, 38 Kan. App. 2d 912, Syl. ¶ 8, 173 P.3d 1159 (2008). Nevertheless, the Board's collection of votes door-to-door after the meeting eliminated the consequences for members who did not attend the meeting to vote in person or who did not designate their votes to proxies. In other words, the Board's interpretation of Declaration Section 11.03b renders its provisions about voting in person or by proxy meaningless. Because we cannot interpret Declaration Section 11.03b in a manner that renders its provisions about voting in person or by proxy meaningless, it is readily apparent that the Board's interpretation is incorrect.

Fourth, the Board ignores that Declaration Section 11.03b specifically controls amendments to the declaration. It is a well-known rule of contractual construction that "[s]pecific provisions in a contract control over general ones." *Exchange State Bank v. Kansas Bankers Surety Co.*, 39 Kan. App. 2d 232, 233, 177 P.3d 1284 (2008). Here, Declaration Section 11.03 falls under "Article 11; Amendment." Declaration Section 11.03b specifically addresses how an amendment may be proposed, how many votes are necessary for the amendment to pass, and how members may vote for that amendment. Declaration Section 1.08, however, falls under "Article 1: Association Membership and Voting Rights." Further, Declaration Section 1.08 contains general rules when "Approval by Members" is necessary.

Indeed, the language the Board relies on under Section 1.08c to collect votes both 60 days before and up to 30 days after the meeting explicitly involves written assent. Again, that language states that Section 1.08c's rules apply to "[a]ny provision of this Declaration or the Bylaws *which requires the vote or written assent* of a specified majority." (Emphasis added.) Yet, Declaration Section 11.03b does not allow amendments to the declaration by written assent. Therefore, it is readily apparent that Section 1.08 is broader than Section 11.03b because Section 1.08 contains language on passing proposals by written assent, a voting method not allowed under Section 11.03b.

22

Thus, to summarize, Section 11.03b involves specific provisions on amending the declaration while Section 1.08 involves general voting provisions. Because Section 11.03b is the more specific provision, the language in Section 11.03b controls over the broader language in Section 1.08. In consequence, because Section 11.03b does not allow passing amendments by written assent, the Board erred by using Section 1.08c's language to collect written assents after the meeting where the Association holds a vote.

In summary, the trial court adopted the Board's argument that it could collect votes "in person" by going door to door after the 2015 annual meeting based on Declaration Section 1.08c's language that members may deliver written assents up to 30 days after the meeting. Nevertheless, this interpretation is incorrect because of the following: (1) the plain language of Declaration Sections 11.03a and 11.03b establish that "in person" voting as stated under Section 11.03b occurs at a meeting; (2) the Board's interpretation of the language "[s]uch votes may be cast in person or by proxy as provided for herein and in the bylaws of the Association" violates the last antecedent doctrine; (3) the Board's interpretation renders the terms "in person" and "by proxy" in Section 11.03b meaningless; (4) the Board's argument ignores that Section 11.03b is the more specific provision that explicitly addresses how to amend the declaration; and (5) the plain language of Declaration Section 1.08c establishes that members cannot approve by written assent in person. Accordingly, nothing in the Association's declaration or bylaws allows the Board of Directors to collect votes door-to-door after the 2015 annual members' meeting where the members voted on the voting procedure amendment.

When discussing election law, our Supreme Court has held that "'illegal votes do not avoid an election unless it can be shown that their reception affects the result.' [Citation omitted.]" *Olson v. Fleming*, 174 Kan. 177, 180, 254 P.2d 335 (1953). Here, Declaration Section 11.03b mandated that the Board receive all votes in person or by proxy at the meeting. Thus, each vote collected after the meeting was invalid. Moreover,

23

it is an uncontroverted fact that at most, the Board had 153 votes at the end of the meeting. This number falls far short of the 370 votes needed to meet Declaration Section 11.03b's requirement of two-thirds approval of all votes allotted to the Association. As a result, the Board's acceptance of illegal votes affected the result of the 2015 voting procedure election. Because the Board did not receive enough votes by the end of the annual members' meeting, the voting procedure amendment did not pass. In turn, the Board's amendment to the declaration including those voting procedures is invalid.

*2016 General Amendment*

Next, we must consider whether the Board's 2016 general amendment is invalid based on the 2015 voting procedure amendment's invalidity.

The trial court held that "because the 2015 Amendment was properly certified and recorded, the 2016 Amendment was properly certified and recorded." Johnson argues that this ruling is incorrect because the trial "court's reasoning [was] infected by the [other] errors" it made. The Board counters that Johnson did not make this argument before the trial court; thus, he cannot raise it for the first time on appeal. Nonetheless, Johnson made the argument about the 2016 general amendment being invalid because the 2015 voting procedure amendment was invalid in both his summary judgment motion and at the summary judgment motion hearing. As a result, we can reach this issue.

When determining whether it had enough votes during the election on the 2016 general amendment, the Board used the rules under the voting procedure amendment. Under the voting procedure amendment, an amendment could pass so long as the Association received the approval of "the Owners by not less than two-thirds of the votes in person or by proxy at a meeting duly called for such purpose . . . ." The Board received a total of 65 ballots during the 2016 general amendment election, with 62 ballots approving the amendment. Thus, it received over two-thirds approval of the votes present

24

at the meeting. Nevertheless, because the 2015 voting procedure amendment was invalid, for the 2016 general amendment to pass, the Board needed to comply with the Association's original voting procedure. Clearly, 62 votes is less than 370 votes. Consequently, the 2016 general amendment is also invalid.

Because the Board's vote collection following the 2015 annual members' meeting requires the reversal of the trial court's decision, we need not consider Johnson's remaining arguments about the Board not having a quorum at the meeting or miscounting the ballots.

*Who is Entitled to Attorney Fees?*

K.S.A. 2018 Supp. 58-4621(a) states that "[a] declarant, association, unit owner, or any other person subject to this act may bring an action to enforce a right granted or obligation imposed by this act, the declaration, or the bylaws. The court may award reasonable attorney's fees and costs."

Based on K.S.A. 2018 Supp. 58-4621(a), the trial court granted the Board's request for $50,000 in attorney fees. The trial court determined that the Board was entitled to attorney fees for the following reasons: (1) the Board substantially complied with the declaration's and bylaws' rules on voting; (2) the Board received the requisite number of votes to pass the voting procedure amendment "[e]ven if the exact number of valid and affirmative votes remain[ed] in dispute"; and (3) Johnson lacked common-law standing.

Johnson challenges the trial court's ruling on attorney fees. He argues that the Board was not entitled to attorney fees because it was not "enforce[ing] a right granted or obligation imposed" as stated under K.S.A. 2018 Supp. 58-4621(a). He also argues that the trial court erred by granting attorney fees because it erred when granting the Board's motion for summary judgment. Next, Johnson argues that this court should grant his

25

request for trial court attorney fees because he properly brought this suit. Last, Johnson requests that this court grant him leave to request appellate attorney fees out of time.

The Board responds that the trial court properly granted its attorney fees request because it was entitled to summary judgment. In making this argument, the Board alleges that Johnson challenges whether K.S.A. 2018 Supp. 58-4621(a) authorized the trial court to grant its attorney fees request for the first time on appeal. The Board further alleges that Johnson did not ask the trial court to award him attorney fees before the trial court. Moreover, the Board has requested that this court grant it appellate attorney fees totaling $17,977.50. The Board has not responded to Johnson's motion to request appellate attorney fees out of time.

Yet, we conclude that neither party is entitled to trial court or appellate attorney fees. As a result, we reverse the trial court's award of $50,000 in attorney fees to the Board, deny the Board's request for appellate attorney fees, deny Johnson's request for trial court attorney fees, and deny Johnson's motion to request appellate attorney fees out of time.

*Applicable Law*

"Generally, a Kansas court may not award attorney fees unless authorized by statute or party agreement." *Rinehart v. Morton Buildings, Inc.*, 297 Kan. 926, 942, 305 P.3d 622 (2013). Whether a trial court has the authority to grant attorney fees under a statute or party agreement is a question of law over which this court has unlimited review. 297 Kan. at 942. Whether the trial court awarded the correct amount of attorney fees is reviewed for an abuse of discretion. 297 Kan. at 942.

Appellate courts are "generally hesitant to award appellate attorney fees to a party that does not fully prevail on appeal." *Richardson v. Murray*, 54 Kan. App. 2d 571, 588,

402 P.3d 588 (2017). Moreover, Supreme Court Rule 7.07(b)(2) (2019 Kan. S. Ct. R. 51) requires attorneys seeking appellate attorney fees to file their request "no later than 14 days after oral argument," or "[i]f oral argument is waived, the motion must be filed no later than 14 days after the day argument is waived or the date of the letter assigning the case to a non-argument calendar, whichever is later."

*Nobody is Entitled to Attorney Fees.*

In his petition, Johnson requested attorney fees. Yet, after making this request, Johnson did not request attorney fees again. That is, he did not assert he was entitled to attorney fees in his summary judgment motion. Nor did he file a separate motion for attorney fees. After filing his petition, Johnson only referenced attorney fees when discussing why the Board was not entitled to attorney fees. As a result, the issue of whether Johnson was entitled to attorney fees was not before the trial court when it denied his motion for summary judgment.

Issues not raised before the trial court cannot be raised for the first time on appeal. *Wolfe Electric, Inc. v. Duckworth*, 293 Kan. 375, 403, 266 P.3d 516 (2011). Because Johnson did not request attorney fees in his summary judgment motion, Johnson cannot request that we grant his request for trial court attorney fees for the first time on appeal. Furthermore, even if we assumed for argument's sake that the issue of Johnson's attorney fees was before the trial court, Johnson did not object to the trial court's failure to make findings of fact or rulings of law on his attorney fee request. Johnson had the burden of objecting to the trial court's findings and rulings if he believed them inadequate. Consequently, we must presume that the trial court found all necessary facts and rulings for its judgment. Thus, Johnson's request for trial court attorney fees fails for this reason as well. See *In re Marriage of Knoll*, 52 Kan. App. 2d 930, 941, 381 P.3d 490 (2016) (holding that a party who fails to object to the trial court's inadequate attorney fees findings and rulings cannot claim error on appeal).

27

Next, Johnson is not entitled to appellate attorney fees because he did not file his request for attorney fees in time. On June 5, 2019, the Board requested to move for appellate attorney fees out of time. The Board explained that this case had been placed on the summary calendar docket on May 21, 2019. It then acknowledged that it had not complied with Rule 7.07(b)(2), requiring parties to file an appellate attorney fees request "no later than 14 days after . . . the date of the letter assigning the case to a non-argument calendar." But the Board alleged that it had misinterpreted the rule; it initially believed that it would have 14 days from receiving the letter to move for attorney fees. Based on this misinterpretation, the Board requested that we grant it leave to request attorney fees out of time. The Board certified that it sent its motion to Johnson's attorney through the "eFlex system."

On June 17, 2019, we granted the Board's request. Seven days later on June 24, 2019, Johnson requested to move for appellate attorney fees out of time. In his motion, Johnson's attorney provided the following explanation why we should let Johnson request attorney fees out of time:  "[He] realized that a motion for fees is due within 14 days after the initial letter indicating that the case will be placed on the summary calendar, rather than 14 days after oral argument or 14 days after the court makes a determination that oral argument is/has been waived. This time is passed."

Johnson's request for appellate attorney fees came 34 days after this court issued its letter stating that the case was assigned to summary calendar. To comply with Rule 7.07(b)(2)'s 14-day time limit, Johnson should have requested appellate attorney fees no later than June 4, 2019. Moreover, Johnson received notice that the attorney fees filing deadline had passed on June 5, 2019, when the Board requested to move for attorney fees out of time. Even so, Johnson did not request to move for attorney fees out of time until June 24, 2019—another 19 days later. As a result, more than 14 days passed after the

28

Board put Johnson on notice that the time limit to request appellate attorney fees had expired.

Rule 7.07(b)(2) does not establish a standard for untimely motions. Nevertheless, our Supreme Court has previously relied on the standard stated in Supreme Court Rule 5.02 (2019 Kan. S. Ct. R. 31). See *Evenson Trucking Co. v. Aranda*, 280 Kan. 821, 844, 127 P.3d 292 (2006). Rule 5.02(c) provides that "[a] motion for an extension of time filed after the time to act has expired must state the reasons constituting excusable neglect." "[E]xcusable neglect is a failure to take some proper step at the proper time, not because of the party's own carelessness or inattention, but because of some unexpected or unavoidable hindrance or accident. [Citation omitted.]" *State v. Keltner*, No. 111,664, 2015 WL 1124699, at *5 (Kan. App. 2015) (unpublished opinion).

Here, Johnson never asserted that some unexpected or unavoidable hindrance or accident caused him to file his request for attorney fees late. Additionally, because Johnson knew he missed the filing deadline as of the date of the Board's request to move for appellate attorney fees out of time, there is no excuse for filing his motion 19 days after the Board's motion. As a result, Johnson has not established excusable neglect, and we therefore deny his request to move for appellate attorney fees out of time.

As to the Board's request for attorney fees before the trial court, Johnson argued that the trial court should not grant the Board's request for attorney fees because the Board's "own actions and inactions were the proximate cause of this litigation." Thus, Johnson argued that the trial court should deny the Board's request because the Board acted improperly during the 2015 voting procedure amendment election. But Johnson never argued that the Board could not receive attorney fees because such fees were not allowed under K.S.A. 2018 Supp. 58-4621(a). Thus, the Board correctly asserts that Johnson raises this argument for the first time on appeal.

29

Still, it is readily apparent that the Board is not entitled to attorney fees for either its expenditures before the trial court or on appeal. Despite its current arguments on appeal, at the summary judgment hearing the Board asserted that it was not seeking attorney fees if the trial court determined that Johnson had standing. Although the trial court determined that Johnson lacked common-law standing, our earlier analysis in this opinion establishes that Johnson had common-law standing because he suffered a cognizable injury. We conclude the Board should be bound by the argument it made before the trial court. Because Johnson had standing to sue, the Board is not entitled to any attorney fees.

Notwithstanding this argument, the trial court abused its discretion by awarding the Board attorney fees. When considering the Board's summary judgment motion, the trial court accepted the Board's arguments as true. Indeed, the trial court accepted the Board's arguments even though it admitted that it had not reviewed all the parties' filings and admitted that it had not counted the ballots. As considered in the preceding sections, however, the Board's arguments were incorrect and unsupported.

A trial court abuses its discretion if it makes an error of law, an error of fact, or an otherwise unreasonable decision. *Wiles v. American Family Life Assurance Co.*, 302 Kan. 66, 74, 350 P.3d 1071 (2015). Here, the trial court legally erred by granting the Board's motion for summary judgment. The trial court's decision to grant the Board's request for attorney fees for $50,000 was premised on this error and in turn, the court's decision to grant the Board's attorney fees request was unreasonable.

As a result, we reverse the trial court's order granting the Board $50,000 in attorney fees. Because the Board has not prevailed on appeal, we also deny the Board's request for appellate attorney fees. See *Richardson*, 54 Kan. App. 2d at 588.

Reversed and remanded with directions. All outstanding motions are denied.